William R. CODY, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Carole HILLARD, President of the Board of Charities and Corrections; Frank Brost, Vice President; Ted Spaulding, Member; D.A. Gehlhoff, Member; Lyle Swenson, Member; James Smith, Executive Secretary; Herman Solem, Warden of the South Dakota State Penitentiary; sued individually and in their official capacities, Defendants.

Civ. No. 80–4039.

United States District Court, D. South Dakota, S.D.

May 31, 1984.

Elizabeth Alexander, Washington, D.C., William D. Froke, East River Legal Services, Sioux Falls, S.D., Douglas P. Cummings, Jr., Sioux Falls, S.D., for plaintiffs.

Mark V. Meierhenry, Atty. Gen., S.D., Mark W. Barnett, Asst. Atty. Gen. and Richard Dale, Sp. Asst. Atty. Gen., Pierre, S.D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

Plaintiff William Cody represents a class of persons who are now or who will be incarcerated in the South Dakota State Penitentiary at Sioux Falls, South Dakota or in the Women's Correctional Facility at Yankton, South Dakota.[1] The plaintiff class challenges the constitutionality under the first, fifth, sixth, eighth and fourteenth amendments to the United States Constitution of numerous conditions and practices of confinement primarily at the South Dakota State Penitentiary (SDSP) and secondarily at the Women's Correctional Facility. Plaintiffs proceed under 42 U.S.C. § 1983[2] and this Court exercises subject matter jurisdiction under 28 U.S.C. § 1343(a)(3).

---

**1.** By stipulation of the parties this court by order filed August 23, 1982 certified plaintiffs' cause as a class action.

**2.** Although plaintiffs also alleged causes of action under 42 U.S.C. §§ 1985, 1988, they have not pursued these alternative causes and the court finds it unnecessary to consider them.

Defendants Hillard, Brost, Spaulding, Gehlhoff, Swenson and Smith are officers or members of the Board of Charities and Corrections of South Dakota, charged with the administration, supervision and maintenance of the SDSP and the Women's Correctional Facility. Defendant Herman Solem is the Warden of the SDSP. Plaintiffs request both declaratory and injunctive relief.

This action was tried to the court seven days in June, (June 7–10, and 13–15) and four days in December (December 13–16), 1983, in Sioux Falls, South Dakota. The case has been fully briefed by the parties and extensive proposed findings of fact have been submitted. At trial plaintiffs called four expert witnesses, and defendants three such witnesses.

The following is a brief summary of the qualifications and areas of testimony of each of the plaintiffs' experts:

1. Robert W. Powitz, Ph.D., Environmental Health, is the Director of Environmental Health and Safety at Wayne State University in Detroit, Michigan. He is a licensed sanitarian in the states of New Jersey and Michigan, and is an accredited sanitarian by the National Environmental Health Association and by the American Academy of Sanitarians. He was a contributing author of an official report by the American Public Health Association entitled "Standards for Health Services in Correctional Institutions." He inspected the SDSP on May 16, 1983, viewing among other things the individual cells, the food service areas and the vocational shop areas.

2. Ronald Sable, M.D., is board certified in internal medicine. He is currently the attending physician in internal medicine at Cook County Hospital in Chicago, Illinois and staff physician at the Cook County Jail. He reviewed and inspected the medical, dental and psychiatric and psychological policies and practices at the SDSP one day in May, 1983.

3. Gordon Kampka is the Vice-President of Abraxas Associates, Inc., a management consultant firm in Fallston, Maryland. He has studied, lectured and written in the fields of criminal justice and public administration; he is a contributing editor to the Journal of Prison Health. He has consulted the National Institution of Corrections, the National Prison Overcrowding Project and several state and local correctional systems. He was formerly employed as Maryland's Secretary for Public Safety and Correctional Services and for approximately six years before that as Warden of the Baltimore City Jail. He conducted a general inspection of the SDSP on June 8, 1983.

4. Lloyd T. Baccus, M.D., is an Assistant Professor of Psychiatry at Emory University School of Medicine in Atlanta, Georgia. He also has a private practice with emphasis in forensic psychiatry. He has served and continues to serve as a consultant to several state corrections systems in the evaluation and administration of mental health care services. He is currently involved in developing with other experts a mental health plan for the Texas Corrections System—this as a result of a class action suit brought on behalf of more than 33,000 inmates challenging the conditions of confinement in various institutions operated by the Texas Department of Corrections. (*see Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir.1982), *cert. denied* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983)). He inspected the mental health care services and policies at the SDSP for approximately one day in September, 1983.

The defendants called the following experts:

1. Bonnie C. Norman, M.S. in Public Administration and specializing in hospital administration, is currently employed and has been for more than seven years as the Director of Medical Services for the Los Angeles County Sheriff's Department. Her primary responsibility in this position is to direct health care services for approximately 14,000 inmates housed in the Los Angeles County Jail system. She has attended and also organized numerous seminars regarding

the administration of health care services in correctional institutions. She has authored articles on health care services in corrections systems, and has participated in drafting, revising and/or auditing state and national standards for the administration of health care services in corrections systems. She inspected the health care services and policies at the SDSP for approximately two days in May, 1983, and one day in December, 1983.

2. Winston Satran is the Warden of the North Dakota State Penitentiary in Bismarck, North Dakota. He has been employed in various correctional positions for approximately sixteen years. He has attended several seminars respecting corrections administration and as a part of his training and experience he has visited numerous state and federal prison facilities. He toured the SDSP for approximately one and one-half days in May, 1983 and again for approximately one and one-half days in December 1983.

3. William R. Gore is a sanitarian from Sacramento, California. For approximately eight years he has served as Program Supervisor, Office of Local Environmental Health Programs, Department of Health Services, State of California. In that position he is in charge of conducting environmental health surveys for numerous state institutions, including nearly all of California's correctional institutions. He has been involved over the years with formulating and applying several national and state standards associated with environmental health aspects of correctional institutions in California. He toured the SDSP, focusing particularly on environmental health concerns raised by the plaintiffs, for approximately two days in December, 1983.

In addition to expert testimony, the court had the benefit of sworn testimony from several corrections officers at the SDSP, including the Warden, other staff and also inmates. The Court also received in evidence 131 exhibits. One of these exhibits, entitled the "South Dakota Penitentiary Study", (hereafter cited "SDSP" Study"), was particularly helpful in substantiating a number of the court's findings of fact. This comprehensive survey, published in 1981, identifies deficiencies in the physical plant as well as in several practices, programs and services at the SDSP. The survey was conducted primarily by a team of professional consultants from Sioux Falls, South Dakota, Chicago, Illinois and Omaha, Nebraska, with the assistance of members of (1) the South Dakota Board of Charities and Corrections; (2) an advisory committee composed of various state public officials such as the attorney general and several legislators; (3) the SDSP staff including the Warden; and (4) the Division of Law Enforcement Assistance. Appendix A to the SDSP Study contains fifty-eight unnumbered pages of evaluations performed by the consultants on specific aspects of confinement at the SDSP. Included in these evaluations are the findings and conclusions of the consultants based in part on the degree of compliance with the "most important" correctional standards promulgated by two nationally-recognized associations of experts in the field of corrections: the American Correctional Association (ACA) and the American Public Health Association (APHA). SDSP Study at 79–80. The Study further presents potential solutions, both current and long-term, to alleviate these various deficiencies, and also identifies the most cost-effective options available to the State.

## I. BACKGROUND INFORMATION

Portions of the SDSP physical plant were constructed more than one hundred years ago. There have been a number of improvements and renovations over the years. There are currently a total of three cell blocks at the SDSP: West Hall, which contains 140 cells; East Hall, which contains 200 cells; and Federal Hall, which contains 100 cells. At the time of trial on December 15, 1983, there were 538 inmates living inside the three cell halls.

Plaintiffs in their complaint allege that (1) the conditions of their confinement at the SDSP amount to cruel and unusual punishment in violation of the eighth and

fourteenth amendments; (2) as to those inmates housed in protective custody, the conditions of their confinement not only amount to cruel and unusual punishment but also deny them equal protection of the laws as applied to other inmates at the SDSP—in violation of the fourteenth amendment; and (3) inmates at the SDSP and at the Women's Correctional Facility are denied meaningful access to the courts, as guaranteed by the Constitution. Specifically, as to the conditions of their confinement at the SDSP, the plaintiff class asserts that (1) various environmental conditions exist in the cell halls, such as inadequate fire protection, inadequate ventilation and heating, lack of hot running water and inadequate water temperature control, insufficient lighting, and inadequate electrical wiring; (2) a number of inmates housed in protective custody and a number of newly admitted inmates housed in the intake area are double-celled; (3) the medical and dental care is inadequate; (4) the mental health care is inadequate; (5) a number of inmates in the general population are double-celled; (6) various environmental conditions exist in the kitchen and food storage area, such as an improper milk pasteurization process, improper food storage, a potential for back siphonage, an unsafe kitchen elevator, and several other unsanitary and improper conditions; and (7) various environmental conditions and practices exist in the shops, vocational programs, and other areas, such as inadequate ventilation, lighting and fire protection, and unsanitary practices and conditions.

## II. FINDINGS OF FACT

## A. ENVIRONMENTAL CONDITIONS—CELL HALLS

### 1. *Fire Safety*

The SDSP provides inadequate on-site fire protection to inmates housed in West, East and Federal Halls. At present there exists in all three halls: an insufficient number of fire safety exits including exit stairs; insufficient night staff to adequately respond to an emergency fire; no remote automatic unlocking devices to simultaneously release inmates from their individual cells; no compartmentalization of these halls by the use of smoke partitions; an absence of a fire alarm system, smoke detectors, sprinklers, emergency lighting, and exit stairs encased with fire-resistant materials. In addition, East Hall is serviced by plastic pipe in the plumbing chases, which pipe would emit toxic vapors in the event of exposure to fire. Inadequate ventilation systems, especially existing in West Hall, compound the aforementioned hazardous conditions. In most prison fires, exposure to toxic vapors and smoke, rather than to the fire itself, poses the greatest threat to the lives of inmates.

### 2. *Ventilation and Heating System*

a. Inadequate ventilation poses a severe health problem. Adequate ventilation constitutes an important environmental factor relating to degrees of comfort and disease prevention.

b. Ventilation in the individual cells in West Hall is virtually non-existent. In East and Federal Halls, ventilation through each cell is generally inadequate. However, the air moves on an even plane from a small vent located on the bottom of the back wall of each cell toward the front of the cell. This lack of air movement poses a health hazard to inmates in the event of a fire. In addition, insufficient ventilation exists in the West Hall shower area.

c. In each of the three halls there exists one heat source for the entire cell block. Heat is pumped into the cells through the baseboards located on the bottom tier of cells. The heat then rises through the upper tiers, creating generally cold temperatures on the bottom tiers and hot temperatures on the upper tiers. This system inadequately distributes warm air through the cell halls and results in generally uncomfortable living conditions. Inadequate ventilation in the individual cells compounds these conditions.

### 3. *Overhead Lighting and Electrical Wiring*

a. In all three halls the cells are poorly lighted. An overhead fluorescent bulb in

each cell furnishes insufficient light in order for inmates to conduct ordinary cell activities. Although inmates are issued small plug-in lamps to supplement the otherwise available light, there still exists inadequate illumination for the entire cell. The lack of adequate overhead lighting compounds the safety hazards due to faulty electrical wiring in the cells.

b. There exists in many cells a significant amount of "jerry-rigged" electrical wiring; i.e., wiring fashioned by the inmates for their own use. This poses a safety and fire hazard to the inmates.

c. In large part, the electrical wiring in the cells is substandard and inadequate. The electrical outlets in many cells, particularly in West Hall, are improperly grounded, thereby presenting a safety hazard to the inmates.

4. *Hot Water and Water Temperature Control System*

a. Basic personal hygiene requires that hot water be available for washing and cleansing.

b. No running hot water is available to inmates in cells in Federal Hall. Rather, hot water is currently delivered to these cells once each day by inmate runners who circulate through the Hall.

c. The hot water temperature in the individual cell wash basins in East Hall measures 140 ° Fahrenheit, presenting potential hazards to inmates such as burning and scalding. The sinks in West and East Hall cells lack an automatic mixing valve to deliver water at reasonably comfortable temperatures. Running water in these sinks cannot be blended manually in the spigot prior to delivery.

B. ENVIRONMENTAL CONDITIONS— KITCHEN AND FOOD STORAGE AREA

1. *Milk Pasteurization Process*

a. The SDSP kitchen is equipped with a batch pasteurizer to purify milk. Pas-

teurization serves to eliminate harmful bacteria and other disease-carrying organisms from the milk.

b. The consumption of improperly pasteurized milk can result in serious disease. Proper pasteurization requires that the temperature readings and the length of time associated with each pasteurization be recorded and regularly monitored by those in charge.

c. On several random occasions milk samples taken from the SDSP batch pasteurizer were determined bacteriologically unsatisfactory by the South Dakota State Chemical Laboratory. Moreover, no temperature and time of duration readings associated with each pasteurization are recorded and monitored by those in charge. These conditions present a health hazard to the inmates.

2. *Food Storage*

a. Proper storage of food serves to prevent spoilage and the spread of food borne diseases. Proper storage is particularly important where the same foods are being prepared for a large, contained population, such as for inmates at the SDSP.

b. The lower level (basement) food storage area stocks primarily canned goods (single service articles) but also other food stuffs. Some of these items are stored under drain pipes which have the potential for breaking or cracking— thereby causing unsanitary spillage over and around these stored foods. It was evident to defendants' environmental health export, Mr. Gore, upon his tour of the area, that such breaking or cracking had occurred in the past. At the time plaintiffs' environmental health expert, Dr. Powitz, inspected this area on May 16, 1983, one of these drain lines had in fact broken, causing waste-water to leak out. Drip troughs are presently in place in an attempt to prevent spillage over these stored food items. However, in the event of a break in a pressure-flow-

type pipeline, the potential for contamination of these food articles is great. Under these conditions the lower level food storage area provides inadequate protection against contamination and therefore presents a health hazard to the inmates.

c. When Dr. Powitz toured the lower level storage area, he saw one dead mouse and fresh mouse droppings along one wall, indicating not only an active mice infestation but also infrequent cleaning in this area. Defendants' environmental health expert, Mr. Gore, also noted mouse droppings in this area upon his tour in December, 1983.

d. Food storage in the kitchen area is deficient. Basic refrigeration space for short-term food storage is inadequate. The freezer space is also inadequate to meet the needs of the total inmate population. The kitchen is not equipped with a walk-in freezer. The existing freezer space presents sanitation problems. The freezer is infrequently cleaned and is overloaded with food items.

Dr. Powitz inspected the freezer and found some food articles stored on the floor of the freezer, thereby subjecting these foods to condensation, dripping, splashing and dirt.

e. The methods of storing meat in the kitchen area are improper in some respects. During Mr. Gore's inspection of the refrigerated meat storage box in the kitchen, he found raw kidneys and other uncooked foods placed above uncovered cheese slices. It is improper to store raw or uncooked foods above uncovered ready-to-serve, prepared foods; storage in this manner subjects these food to potential contamination and adulteration.

3. *Kitchen Elevator*

a. The kitchen elevator is outdated and unsafe. The heavy metal doors of the elevator must be manually opened and closed by the passenger. These doors are not equipped with handles on the inside, but only on the outside. Therefore, in order to operate the elevator, a passenger must stand inside and at the same time reach outside the elevator to close the doors.

b. There have been two reported incidents of injuries incurred by inmates who have slammed their hands in between these elevator doors in an attempt to operate the elevator.

4. *General Kitchen Practices and Conditions*

a. Ventilation in the kitchen areas is makeshift and inadequate. Stand-up fans are used to distribute air in the closed area. The kitchen hoods lack an ancillary fire protection system.

b. Many pots and pans and a majority of dining utensils are in a state of disrepair to the extent that they cannot be properly cleaned and sanitized.

c. The kitchen oftentimes serves as a walk-through area for inmates, particularly those proceeding to the infirmary. The use of the kitchen in this manner is both unsanitary and a bad practice. Inmates and other plainclothes people may in this way expose the kitchen area to germs, dirt and viruses. This increases the potential for contacting and spreading communicable diseases among the inmates.

It is also possible for inmates in the general population to sabotage the area by placing, for example, foreign matter in foods ultimately consumed by inmates and staff.

d. Hair restraints (ie., hair nets) or hair covering of some sort for the kitchen staff, along with proper footwear are necessary to maintain a sanitary environment in the kitchen area.

e. The ice machine is inadequately maintained and serviced. This causes a build-up of mold, minerals and stains on the interior walls of the machine, resulting in unsanitary conditions.

f. At the time Dr. Powitz visited the kitchen area, frozen fish were being thawed in still water rather than, for example, under running water. This an

improper method for defrosting frozen foods.

g. The kitchen area is not equipped with a separate lounge for the inmate kitchen staff. As a result, the staff use the kitchen area as a lounge. This is an unsanitary practice in a food preparation area.

h. The dishwashing area is characterized by excessive noise, some of which cannot be avoided.

i. At the time of Dr. Powitz' tour of the kitchen area, the temperature in the milk holding box registered 48° Fahrenheit. This temperature is excessive for storing a potentially hazardous food product such as milk.

j. Overall, the kitchen area is maintained in a sanitary condition.

## C. ENVIRONMENTAL CONDITIONS—SHOPS AND VOCATIONAL PROGRAMS

a. In the welding shop, exhaust ventilation is inadequate in the midshop welding booths. Toxic fumes produced from the welding benches are directed up into the welder's breathing zone. There is no scavenger ventilation system to remove such fumes from the air at their source. This presents a health hazard to the inmates.

b. In the furniture upholstering shop, particularly in two spray booths, the ventilation is inadequate to remove fumes toxic to the liver.

c. Several drums containing a considerable amount of solvent are improperly stored in the sign shop. These drums are not kept in a storage cabinet or room designed specifically for the storage of solvent—thus creating a fire hazard to the inmates.

d. In the barbershops there are no sanitizers used on the combs, brushes and clippers and no single service neck papers. These unsanitary conditions can cause skin infections.

e. In the book bindery, tag and sign shops there are no safety or lock-out devices on any of the presses and paper cutters. This presents a safety hazard to the inmate workers.

f. One inmate worker injured his hand when the printing machine in the print shop was unexpectedly engaged—even though the safety shield on the machine was in place and this was designed to prevent operation of the machine.

g. Several table saws and other power tools in the carpentry shop lacked adequate devices to collect and remove sawdust from the air.

## D. ENVIRONMENTAL CONDITIONS—OTHER AREAS

a. The lighting in the underground corridor leading to the recreation building is inadequate.

b. Several unsanitary conditions and practices exist in the infirmary. Transfer forceps are improperly stored in a disinfectant solution which has the potential for contamination. There are no vacuum breakers attached to the x-ray developer and the washtub in order to prevent back siphonage flows into the regular water system. A deep fat fryer is sometimes used in the infirmary without proper ventilation or fire prevention equipment.

## E. CONDITIONS OF CONFINEMENT—DOUBLE–CELLING

### 1. General

a. The general inmate population at the SDSP has increased dramatically since 1974. In October, 1983 the inmate population reached an all-time high of approximately 560 men housed inside the walls of the prison. Taking all three cell halls, the SDSP is equipped with a total of 440 cells.

b. At the time of trial on December 15, 1983, there were 538 inmates living inside the three cell halls. Ninety-eight cells (196 inmates) were doubled up. Therefore, as of December 15, 1983, the SDSP was over physical capacity by ninety-eight inmates (approximately 22 per cent).

c. Approximately seventy-five to eighty per cent of the inmate population at the SDSP are serving sentences for non-violent crimes. Approximately fifty-five per cent of the population are first offenders.

d. West Hall contains 140 cells which each measure approximately sixty-three square feet in space. East Hall contains 200 cells, each measuring approximately fifty-six square feet in space. Federal Hall contains 100 cells, each measuring approximately fifty-five square feet in space.

### 2. *Impact of Double-Celling*

a. Double-celling, depending on such factors as the extent and duration of this practice, the size of the double cell, and the amount of out-of-cell time afforded these inmates, places stress on both staff and inmates as well as on existing programs, services, equipment and the physical plant at the SDSP. Double-celling over time has a negative impact on all programs and services, including medical, food and laundry services, and work, recreation, and school programs. Double-celling over time also affects the level of tension among inmates and staff in a prison.

b. Double-celling at the SDSP has resulted in crisis management with respect to the maintenance of ancillary support facilities such as food services, laundry services, medical services, plumbing and electrical wiring.

c. Double-celling at the SDSP has resulted in an overloading of services such as the work, recreation and school programs.

d. The SDSP administration has attempted to reduce the negative impact of double-celling by expanding the amount of out-of-cell time afforded inmates, by making a reasonable effort to double-cell only those inmates who volunteer to live with another inmate in the same cell, and by increasing the placement of inmates: (1) into trustee status in a detached unit of SDSP, located immediately outside the walls of the prison, known as the "Cottage"; (2) into trustee status in a unit located at the Human Services Center in Yankton; (3) into a detached dormitory, outside the walls of the prison, known as the "West Farm"; (4) into public service restitution programs in various communities in South Dakota. There are presently approximately 220 to 230 inmates housed outside the walls of the prison.

e. The SDSP has also attempted to place inmates in work release or school release programs throughout the state. There are approximately thirty-five to forty inmates participating in these programs.

f. There is a relatively low level of tension between inmates and staff at the SDSP. Since the advent of double-celling in approximately the first part of 1981, there has been one recorded instance of a riot involving approximately twenty persons in November, 1981, and approximately sixty incidents (recorded in the disciplinary logs for the period January 1, 1981 to June 30, 1983) of fighting or assaults between inmates and/or inmates and staff.

g. The SDSP is grossly under-staffed. The level of prison staff has not increased in proportion to the level of the general inmate population.

### 3. *Availability of Jobs*

a. There are approximately 200 inmates in the general population inside the walls of the SDSP who are without jobs. For various reasons, approximately 30 to 40 of these inmates do not wish to work outside of their cells. That leaves approximately 150 inmates who want to work, but for whom no jobs are available.

b. An over-capacity inmate population at the SDSP has a negative impact on the availability of jobs for a significant number of inmates.

### 4. *Public Health Impact of Double-Celling*

a. Double-celling at the SDSP creates a serious potential both for injuries and the

spread of communicable diseases among the inmates. In order to reduce this potential public health problem it is a generally recognized standard that each inmate should be accorded a minimum of 60 square feet of living space. Double-Celling at the SDSP presently precludes 196 inmates (representing approximately 36 per cent of the total inmate population) from attaining this standard.

b. The majority of double-celling at the SDSP exists in the West Hall cells, which lack adequate ventilation (see Findings of Fact No. II(A)(2) supra.) There are also a number of double cells in Federal Hall in which no running hot water is available to the inmates.

c. There is an increased potential for inmates who are double-celled to contact upper respiratory diseases.

d. In 1983, two inmates housed in the double-celled areas were treated for a communicable disease. One of these inmates was treated for pediculosis. Another inmate was diagnosed, after approximately two months of medical attention at the SDSP, by an outside dermatologist as having contracted scabies. By the time he was referred to the dermatologist, this inmate had a rash covering all areas of his body. In response to this diagnosis for scabies, only those individuals housed on this inmate's same tier were treated prophylactically for scabies.

5. *Double-Celling in the Intake Area*

a. The intake area at the SDSP where newly admitted inmates are housed, has a capacity of seventeen cells. On occasion as many as seven or eight of these cells are doubled up. Newly admitted inmates may spend from eight to fourteen days in this area.

b. Double-celling in the intake area has occurred and will likely occur in the future.

c. The SDSP administration makes reasonable efforts: to double-cell new admittees who are compatible with one another; to provide these inmates a sufficient amount of out-of-cell time in orientation and training activities; and to reduce the total amount of time these inmates are double-celled.

d. From a public health standpoint, it is inappropriate to double-cell new admittees. The potential for inmates to contract contagious disease is heightened because these inmates have not been medically screened prior to entering this area. Double-celling new admittees also impedes legitimate correctional objectives in successfully orienting and screening new admittees.

6. *Double-Celling in the Protective Custody Area*

a. Out of approximately 45 inmates housed in protective custody, 22 inmates are double-celled.

b. The practice of double-celling inmates housed in protective custody at the SDSP is inappropriate and without correctional justification. These inmates need protection not only from other inmates in the general population but also from other protective custody inmates. The negative impact attributed to double-celling in other areas of the institution is exacerbated in the protective custody area due to the inordinately limited out-of-cell time available to these inmates.

F. CONDITIONS OF CONFINEMENT—PROTECTIVE CUSTODY INMATES

a. There are approximately forty-five inmates at the SDSP in protective custody. These inmates are provided protection from the general inmate population for a variety of reasons.

b. Inmates in protective custody do not generally have equal access with the general inmate population to jobs and programs at the SDSP.

c. It is sound correctional policy to provide protective custody inmates equal access with the general inmate population to jobs and programs as long as protective custody inmates can be adequately protected and a safe environment maintained.

d. Approximately ten protective custody inmates hold jobs. Most protective custody inmates perform laundry jobs which are reserved exclusively for these inmates. Also one or two protective custody inmates work in the protective custody area as runners or clean-up men.

e. It is possible for the SDSP to safely provide protective custody inmates with equal access to jobs and programs.

f. There are no protective custody inmates enrolled in the regular school program at the SDSP. The regular school program enrolls approximately 400 to 500 general population inmates per year.

g. One or two protective custody inmates are participating in the education program by correspondence from within their cells. Inadequate staff prevent the SDSP from extending to protective custody inmates the benefits of regular classroom schooling.

h. There are no protective custody inmates enrolled in vocational programs at the SDSP.

i. Several special classes, involving instruction in art, first aid and self-motivation and offered to inmates in the general population, are not available to protective custody inmates. An alcohol and drug dependency awareness class is available to protective custody inmates.

j. Protective custody inmates can use the law library only on Thursdays from 9:00–11:15 a.m. and from 1:00–3:30 p.m.

k. Protective custody inmates are denied Class I contact visits with outsiders unless these inmates waive their right to protection during these visits. Contact visits by protective custody inmates are currently conducted at the same time as those for general population inmates. The contact visitation room has a capacity for approximately sixty people. No guards are stationed in the room during contact visitation.

*l*. Protective custody inmates are allowed three out-of-cell recreation periods per week for a total of one and one-half to three hours per week.

m. A protective custody inmate who does not have a job spends approximately twenty-three hours per day in his cell.

n. Protective custody inmates receive less out-of-cell recreation time than do inmates housed in close custody in the Adjustment Center. Inmates housed in close custody in the Adjustment Center, by court order (see Judicial Notice of Judgment in *Wabasha v. Solem*, No. 79–4064, slip op. at 4 (D.S.D.Feb. 18, 1983)) receive at least five exercise periods per week for forty-five minutes each, for a total of at least three hours, forty-five minutes.

o. Protective custody inmates go to the dining room to pick up their food (at a time when inmates in the general population are confined to their cells) but return to their own cells to eat their meals. The only eating utensil provided is a spoon.

p. The policies and practices associated with protective custody status at the SDSP, particularly in terms of excessive in-cell time and a basic lack of access to programs and activities, are similar to those associated with punitive segregation status at most institutions.

q. The above-identified policies and practices associated with protective custody status at the SDSP with respect to a basic lack of access to jobs, programs and activities, and excessive in-cell time, constitute serious deficiencies without correctional justification. These deficiencies could be remedied without major expense or institutional restructuring.

## G. CONDITIONS OF CONFINEMENT— MEDICAL AND DENTAL CARE

### 1. *Use of Inmate Workers*

(i) Initial examinations and Screening Functions.

a. Mr. Shelton, one of the inmate medical workers at the SDSP, has no formal training or education in the medical field.

b. Mr. Huth, formerly an inmate dental assistant, had no formal training or education as a dental assistant.

c. There are no nurses or qualified medical staff regularly scheduled at the SDSP between the hours of 8:30 p.m. and 7:30 a.m. on weekdays, or at any time on weekends. During this time, Shelton or another inmate medical worker would perform an initial examination on any inmate needing qualified medical attention. For example, if Shelton was called to attend to an apparent heart attack victim at a time when no qualified medical staff were present, he would take the patient's history and vital signs, review the patient's medical chart, and report the results of his examination by telephone to the doctor on call. This practice has since changed in that Shelton no longer has access to a patient's medical record.

d. Mr. Shelton occasionally performs visual examinations of an inmate's genitals at the request of the nurses.

e. During times when the dentist is not present at the SDSP, the inmate dental workers screen inmate requests for dental service. There are no written rules or guidelines which regulate the manner in which inmates are selected for dental care and treatment. Inmate dental workers assist the nurses in scheduling other inmates for dental treatment. It is inappropriate for inmate dental workers under these circumstances to be involved in scheduling other inmates for dental services.

f. In scheduling inmates for medical treatment, the nurses would give Shelton the medical charts of those inmates requesting medical treatment. Shelton in turn makes a list of these names, signs passes that will summon these inmates to the infirmary, and finally gives this list and the passes to a prison official who then will issue the passes and summon the inmates for treatment. It is inappropriate for inmate medical workers to be involved in scheduling other inmates for medical treatment.

(ii) *Inmates' Access to Medical Records*

a. Mr. Shelton is involved in typing and filing inmate medical records. During times that the nurses are present, Shelton has access to inmate medical records.

b. Inmate workers have on occasion made entries in the medical records.

c. Until approximately one month before trial in June, 1983, Shelton had a key to the files for inmate medical records.

d. It is inappropriate for inmate workers to have any sort of access to the medical records of other inmates.

(iii) *Treatment of Other Inmates*

a. Until approximately one month before trial in June, 1983, Shelton routinely performed medical x-rays on other inmates. Shelton received on-the-job training in how to perform x-rays from another inmate medical worker.

b. During times when Mr. Shelton was absent, Mr. Huth performed medical x-rays on other inmates.

c. Shelton routinely developed and performed a first reading on an x-ray. If Shelton, in reading an x-ray, discovered for example, in his estimation, a possible fracture of a bone, he would submit the x-ray to a nurse for a second reading. On the other hand, if Shelton, after performing a first reading of the x-ray, determined that there was no fracture, he would not submit the x-ray to a nurse for a second reading.

d. Until approximately one month before trial in June, 1983, Shelton routinely performed medical x-rays on other inmates during times when no qualified medical personnel were present at the SDSP. During these times, if Shelton, in performing the first reading of an x-ray, discovered in his estimation, an apparent hairline fracture of a bone for example, he would wrap the area around the bone with an ace bandage and give the inmate an order slip for ice and either Tylenol or aspirin. Shelton would not contact qualified medical personnel under these circumstances. On the other hand, if Shelton in his own estimation determined a bone fracture to be serious, he would

notify a prison official who would then decide whether to call upon a qualified medical person.

e. Although during the time when Shelton was performing medical x-rays he received monthly reports with respect to how much his body had been exposed to x-ray radiation, he never understood these reports and no qualified medical personnel assisted him in interpreting these reports. Shelton was never instructed by qualified medical personnel on x-ray safety precautions and procedures.

f. In October, 1983, an inmate was given a medical x-ray by a prison guard who had no formal training or education in the use of x-ray equipment. Shelton advised the guard as the guard performed the x-ray.

g. It is inappropriate for inmate medical workers having no formal training or education in the medical field to perform medical x-rays on other inmates. It is also inappropriate for such inmate medical workers to perform a first reading of medical x-rays. On-the-job training of a medical inmate worker by another medical inmate worker in the use of x-ray equipment is inappropriate.

h. Mr. Huth, the inmate dental worker, routinely performed dental x-rays on other inmates. Normally there were no qualified medical personnel present when Huth performed x-rays. In order to take dental x-rays, Huth routinely placed his hand within the inmate patient's mouth to position the x-ray film.

i. It is inappropriate for inmate dental workers having no formal training or education in the use of dental x-ray equipment and the proper procedures and safety precautions for its use to perform dental x-rays on other inmates.

j. During a time when no qualified medical personnel were present at the SDSP, Mr. Almont, an inmate dental worker, attempted to perform an EKG exam with the assistance of Shelton upon another inmate who was experiencing heart problems. Neither Shelton nor Almont possessed proper training in the use of an EKG machine or in reading and interpreting the output from such a machine.

k. During a time when qualified medical personnel were not present, Shelton treated an inmate who had injured his chin. After he examined the injury, Shelton determined that it would require stitches. Shelton then notified a prison official, who sent the inmate patient out of the institution for qualified medical treatment.

l. During this same time (when qualified medical personnel were not present) Shelton treated an inmate who had lost consciousness and was transferred to the SDSP infirmary from the prison farm, which is approximately twelve miles from the main prison. Shelton treated the inmate for approximately five minutes before a qualified prison nurse arrived in answer to the emergency.

m. During this same time when there were no qualified medical personnel present at the SDSP, Shelton treated an inmate who experienced breathing problems. The treatment consisted of setting the inmate up to a breathing machine.

n. On occasions when Shelton was not present, Huth participated in treating medical emergencies among the inmate population. Such treatment typically consisted of treating and bandaging the wounded area but also consisted of, for example, attempting to administer oxygen to a potential heart attack victim.

o. Huth routinely assisted the dentist at the SDSP in performing amalgrams [fillings], bridge and dental work on inmates.

p. During times when the dentist was not present and an inmate complained of a sore tooth, Huth routinely treated the inmate by placing a temporary filling in the sore tooth. On occasion an inmate treated with such a temporary filling would not be scheduled to see the dentist until he again complained of a sore tooth.

q. On occasions when the dentist was not present, Mr. Almont would operate both a low and high speed drill on anoth-

er inmate's mouth—in an attempt to grind down a crown or a chipped tooth or a burr from a temporary filling, or to adjust the bite on a filling.

r. It is inappropriate for inmate workers, whether dental or medical, to be in any way involved in the direct treatment of another inmate.

## 2. *Emergency Medical Care*

a. There are no protocols, i.e., written guidelines setting forth the systems and procedures to be employed in responding to a particular emergency, governing emergency medical care at the SDSP.

b. Correctional officers at the SDSP are not required to achieve or to maintain certification in cardiopulmonary resuscitation (CPR). Although the SDSP administration makes reasonable efforts to train custodial staff in CPR, the institution does not maintain adequate documentation of such training. As a result, there is no established system at the SDSP to ensure that a custodial staff person properly trained in CPR will be called upon in the event of an emergency.

c. During times when no qualified medical personnel are present, inmates requiring medical treatment are examined initially by an inmate worker.

d. In the event of a medical emergency during a time when qualified medical emergency personnel are not present, the decision whether to call for an ambulance rests ultimately with a supervisor. It takes approximately two to three minutes for a correctional officer responding to an emergency to obtain the necessary keys to open up the cell and attend to the stricken inmate. It takes approximately two to three additional minutes for the supervisor to reach the cell in order to make a decision whether to call for an ambulance. Depending on the circumstances, a correctional officer junior in command to the supervisor may make the decision whether to call for an ambulance. If an ambulance is summoned it normally takes from ten to twenty-five minutes for the ambulance to arrive at the scene of the emergency.

e. The SDSP does not have a crash cart, nor does it have all the medical equipment normally found on a crash cart.

f. The SDSP lacks adequate resuscitation equipment. Not all corrections officers are trained in the proper use of existing resuscitation equipment.

g. Aside from the above-detailed deficiencies in emergency care, the SDSP staff has taken reasonable efforts to properly respond to and treat medical emergencies.

## 3. *Prescription Drugs*

a. There is no formulary, i.e., a list of those prescription drugs which qualified medical personnel choose from in prescribing medication for a particular condition, of prescription drugs at the SDSP.

b. The SDSP infirmary has a written policy prohibiting physicians from prescribing certain medications for the inmates. The list of prohibited medications includes: sleeping medications of any type; pain relievers such as darvon, talwin, demerol, codeine and methadone; minor tranquilizers such as serax, librium, valium; mood stimulators such as dexedrine and ritalin; appetite suppressants of any type; and various cough medicines such as robitussin, terpin hydrate, and various codeine preparations. Under certain circumstances a physician at the SDSP may find it necessary to indicate one of the above enumerated drugs in treating an inmate; it is inappropriate to strictly prohibit the use of these medications by a treating physician.

c. The SDSP infirmary also has a written policy discouraging physicians at the SDSP from prescribing certain anti-asthmatic preparations (such as aminophyllin, amesec and tedral) and certain anti-convulsant medications (such as dilantin, mysoline and phenobarbital) in treating inmates. It is inappropriate to strictly limit and discourage a treating physician

at the SDSP from prescribing these medications under all circumstances.

d. At present corrections officers at the SDSP deliver pre-packaged unit-dose prescription medications, which are brought into the institution each day and inspected by the registered nurse, to those inmates who have been indicated for treatment. This procedure for dispensing prescription medications is adequate. However, there is currently no procedure by which the receiving inmate acknowledges, by his signature or his initials on a form to be filed in his permanent medical file, receiving or refusing to receive the prescription medication. It is inappropriate for the SDSP staff to only record those instances when the inmate refuses his medication, rather than recording both instances where the inmate receives his medication and when the inmate refused to receive his medication.

e. One inmate, Mr. Lone Eagle, was admitted to the SDSP in December, 1982, while on prescribed medications of, among other things, dilantin. Mr. Lone Eagle's medical records revealed a history of epileptic seizures, for which he was placed on dilantin in 1979. For approximately four or five days after he was admitted to the SDSP, Mr. Lone Eagle did not receive his prescribed medications. An inmate who enters the SDSP while on a prescription for dilantin and whose medical records indicate a history of seizures should be continued on dilantin until receiving a full medical evaluation. Since being admitted, Mr. Lone Eagle has experienced three seizures—each one of them occurring at a time when he was denied his prescription medication.

f. In September, 1983 there were approximately 27 inmates on major tranquilizers at the SDSP. It is important for inmates on major tranquilizers to be regularly monitored by the treating psychiatrist, on a schedule ranging from several times a week to once every three months, depending on the stabilization of the individual. Proper monitoring procedures allow the psychiatrist to regulate the dosage of the particular tranquilizer given the inmate, and to detect possible harmful side effects from the particular tranquilizers, such as creating deficiencies in the immunity system. The SDSP has no written policies governing such a monitoring procedure, nor is there any indication that the SDSP maintains such a monitoring procedure.

### 4. *Provisions for Special Diets*

a. The SDSP provides one general food line and one special food line. The special diet line consists of low-salt or no-salt content foods, with a salt substitute available.

b. Although there are no records kept regarding the names and the number who are diabetic, it is estimated that there are approximately six diabetics at the SDSP. There is no special diet line provided for these diabetic inmates, nor are the various foods included in the general or special food lines labeled as to their nutritional or calorie content. These deficiencies are offset by the reasonable attempts made by the SDSP nurses to educate these diabetic inmates on a one-to-one basis regarding their special dietetic needs. These inmates are also given literature by the nurses, explaining proper diabetic diet control. So long as diabetic inmates receive proper dietary counseling by trained staff, these inmates can make appropriate food selections from either the general or special diet line in order to properly control their diet.

c. The SDSP adequately provides for the special dietary needs of the inmates.

### 5. *Protocols*

a. Protocols, i.e., written statements of policy and procedure, enable the health care staff to appropriately respond to the health care needs of the prison inmates. Protocols assist the health care staff and the prison administration in setting in advance various policies and procedures to be followed in meeting the health care

and needs of the inmates. Protocols also protect the inmates.

b. At present there are no protocols at the SDSP relating to standing orders and telephone orders received by the nursing staff from the attending physicians; emergency care; infection control and reporting; treatment of hypertensive inmates; treatment and monitoring of inmates on psychotropic drugs or major tranquilizers; and the treatment and monitoring of inmates on INH medication.

c. In March, 1983, the SDSP adopted written policies relating to: general health care services; dental care; the use of inmate workers; the provision of medical, dental or orthopedic prostheses; infirmary care; notification of serious illness or death; employee use of institutional medical staff and facilities; the maintenance of medical records; a prohibition on medical experimentation upon inmates; provisions for informed consent; psychiatric transfers; utilization of pharmaceutical products; and optometric services. In general these protocols are inadequate and incomplete; they fail to describe in specifics the policies and procedures associated with each area of health care.

### 6. Medical Records

a. At present the medical records of inmates at the SDSP are inadequately organized. The records are not placed in an inmate's medical file in any particular order. Also, the information contained in an inmate's medical file inadequately identifies such areas as the subjective, objective, assessment, and planning data associated with the inmate's care and treatment while at the prison.

b. Aside from these deficiencies the medical records and files of the inmate at the SDSP are kept in a satisfactory manner.

### 7. Quality Control

There is at present no defined quality control program at the SDSP, particularly governing laboratory services.

### 8. Staff

a. There are an equivalent of three full-time registered nurses at the SDSP. This is an inadequate number of full-time registered nurses.

b. There are two physician sessions and one physician's assistant session per week for an average of two to three hours each at the SDSP. The attending physician or physician's assistant makes reasonable efforts to see every inmate scheduled for examination and/or treatment.

### 9. Financial Constraints on Medical and Dental Services

a. Inmate James Weinandt has a severely deformed left foot, which was operated on prior to his admission to the SDSP. After his admission to the SDSP and during a general physical examination by a SDSP physician, Weinandt was told, in reference to his physical deformity, that there was nothing that could be done for his foot. Mr. Weinandt was issued regular, hard-soled inmate shoes upon his admission to the SDSP. Weinandt suffered bruises and blisters on his left foot as a result of wearing these shoes; he requested of SDSP officials that he be issued tennis shoes in place of the other shoes. Weinandt was then informed by prison officials that he could have tennis shoes only if he could pay for them; Weinandt could not afford to pay for the tennis shoes. Weinandt was further informed that he could not leave his cell without wearing shoes. Approximately one week before Weinandt's trial testimony in June, 1983, he was informed that he would be issued a pair of tennis shoes.

b. Inmate Thomas S. Seidschlaw was referred to an outside dermatologist by a SDSP physician, for treatment of a severe acne condition. The dermatologist examined Seidschlaw and prescribed among other things the medication Acutane which is a drug used to treat severe

acne problems. Seidschlaw's medical records indicate that the day following his visit to the dermatologist, the SDSP physician reviewed the dermatologist's recommendations for treatment and issued the following order to the on-duty nurse: "Do not start Acutane at present [check with the] administration regarding cost (Acutane therapy as ordered would cost $100 per month) ...." The associate warden was notified that same day and, according to Seidschlaw's medical records, approximately four days later the warden and the associate warden ordered the permanent discontinuance of Acutane therapy on Seidschlaw. The outside dermatologist described his recommended treatment as "medically necessary" in the treatment of Seidschlaw's severe acne condition.

c. The expense associated with prescribing and monitoring the Acutane treatment for Seidschlaw, as recommended by the dermatologist, was a factor in discontinuing such treatment. If Seidschlaw had offered to pay for the Acutane treatment himself, it would have been prescribed for him.

d. It is inappropriate for a warden, an associate warden or any member of the prison administration staff to overrule a specialist's medical judgment on the sole ground that the recommended treatment is too expensive.

e. It is improper to deny an inmate medical treatment based solely on the cost of the treatment.

f. Inmate Earl Anderson has a skin condition consisting of lesions, blisters, eruptions and open sores. This condition covers most of his body and has been a recurring problem for many years. Anderson's condition recurred in late October, 1983, and he was given medication which caused facial swelling, extreme irritation to the problem areas of his skin, and an increase in the redness of the rash. Anderson subsequently requested an appointment with an outside dermatologist, but he was told that it could be three and one-half months before he could see a dermatologist. Therefore on his own initiative Anderson called a dermatologist direct and arranged for an appointment. Anderson was then told by correctional staff at the SDSP that he would lose his trustee status if he kept the appointment with the dermatologist. Anderson cancelled his appointment. Subsequently, Anderson consulted with counsel for the plaintiffs and shortly thereafter an appointment with an outside dermatologist was arranged. As a result of treatment by this dermatologist, Anderson's skin condition has generally been suppressed.

g. There are no written policies with respect to whether various medical procedures are elective or necessary in any given instance. A mandatory or necessary medical procedure leaves no discretion in the treating physician to deny or withhold treatment by such a procedure; elective procedures on the other hand leave to the treating physician relatively full discretion in determining whether, under all the circumstances of the particular case, to provide or to withhold treatment by way of such a procedure. On occasions the medical and dental staff at the SDSP have consulted the warden regarding whether in individual cases an elective or somewhat doubtful elective treatment or procedure should be performed in light of the expense associated with such a treatment or procedure. The SDSP has failed to establish clear written guidelines relating to cost and elective procedures.

h. In the absence of protocols distinguishing elective from necessary medical services, the decision whether a particular procedure or treatment is elective or medically necessary is one properly left to the treating physician.

H. CONDITIONS OF CONFINEMENT—
 PSYCHIATRIC AND PSYCHOLOGI-
 CAL CARE

1. *Staff*

a. At present there is one psychiatrist at the SDSP who performs his work on a

volunteer basis. The psychiatrist visits the institution one day each week for approximately five hours. One visit per month is typically devoted primarily to performing inmate evaluations for the parole board.

b. The psychiatrist's direct involvement with inmates is largely devoted to identifying and assessing a particular inmate's needs and treatability, prescribing medication and occasionally arranging the transfer of certain inmates to the Human Services Center in Yankton. The actual psychiatric treatment provided by the psychiatrist to the inmate patients is normally limited to prescribing medications, brief counseling, conducting intermittent follow-up examinations until the patient is stabilized, and referring patients to other personnel within the SDSP or to other persons or institutions outside the SDSP. At the time of trial in June, 1983, the psychiatrist was engaged in individual psychiatric therapy, on a continuing basis, with two inmates. The psychiatrist visited one of these inmates approximately five times in five months; the other inmate had been visited approximately three times in six weeks. It is not possible under present circumstances for the psychiatrist to conduct long-term psychotherapy on individual inmates experiencing non-emergency mental problems, i.e., inmates having a difficult time adjusting to the prison environment.

c. The SDSP employs one full-time psychologist.

d. The psychologist's first priority and the largest single part of his work consists of performing a series of psychological tests and evaluations on inmates upon their initial entry into the SDSP. The psychologist does not see any inmate on a regular counseling basis. The SDSP psychologist does some counseling for inmates with mental problems of a less severe nature; he typically spends approximately one-half hour to forty-five minutes a day (the equivalent of approximately one or two interviews per day or eight to ten interviews per week) counseling inmates.

e. The SDSP employs seven full-time counselors and the equivalent of two and one-half full-time drug and alcohol counselors.

f. It is important for a prison institution to have a sufficient counseling staff. Adequate counseling staff reduces the number of instances in which individuals in the general population deteriorate both physically and mentally, thus reducing the number of inmates who must be referred to a mental hospital for psychiatric treatment. Adequate counseling services aid in the treatment and prevention of mental health problems among the inmate population by enabling qualified personnel to intervene at an early stage in the diagnosis, care and treatment of these problems. Adequate counseling services also assist, for example, in the continued monitoring of inmates who have returned to the general population after having been removed from the general population for psychiatric treatment. At present, the counseling staff at the SDSP does not have time to adequately perform psychotherapy or psychological treatment on inmates.

2. *Demand for Mental Health Services*

a. There are approximately 20 to 25 psychotic inmates at the SDSP. The SDSP psychologist encounters inmates during the intake evaluation and assessment process whose psychological problems are so severe that these inmates will potentially experience or have experienced and will continue to experience a deterioration in their physical health. There are occasions at the SDSP when inmates experiencing a deterioration in their physical health due in part to mental health problems have not been referred to or treated by qualified personnel, so that the physical health of these inmates continues to deteriorate.

b. There are inmates at the SDSP who have serious psychiatric needs which are not being addressed by qualified personnel.

c. It is estimated by the psychiatrist at the SDSP that at least ninety-five per cent of inmates at the SDSP have personality disorders.

d. An inmate's mental condition need not present a risk of harm to himself or to others before psychiatric intervention by qualified personnel is required. Psychiatric intervention is clearly necessary in those instances where an inmate is contemplating suicide or where he exhibits psychiatric symptoms in such a degree that the inmate presents a risk of harm to himself or to others. There are also instances in which psychiatric intervention is necessary where an inmate exhibits psychiatric symptoms short of the contemplation of suicide or the risk of harm to himself or to others. An inmate experiencing significant personality distress in the form of depression or psychotic symptoms to the degree that he has lost contact with reality not only requires but is amenable to psychiatric intervention and treatment.

e. Upon inmate Charles P. Lone Eagle's admission to the SDSP it was recommended (on the basis of a report by an outside psychiatrist who examined Mr. Lone Eagle) by the judge who sentenced him that the SDSP consider giving Mr. Lone Eagle psychiatric treatment. Mr. Lone Eagle met with the volunteer psychiatrist at the SDSP on three or four occasions; the average length of these meetings was three or four minutes. Mr. Lone Eagle has not been seen by any other psychiatrists since his admission to the SDSP. Mr. Lone Eagle has received no group or individual psychiatric therapy (other than his brief encounters with the psychiatrist) since his admission to the SDSP, other than through Alcoholics Anonymous meetings. There is no indication that Mr. Lone Eagle ever received a comprehensive psychiatric examination and assessment (including a full mental status examination and a review of all pertinent personal, family, work and education background and history) to determine whether intensive psychiatric treatment is required.

f. It is not uncommon for inmates to attempt to interfere with or to obstruct a psychiatric inmate's medication treatment plan. In order to minimize the potential for such interference or obstruction, an institution needs adequate staffing to maintain a sufficient level of contact with the inmate-patient.

g. One inmate who eventually committed suicide in 1983 and who, prior to this time, was taking medication pursuant to a treatment plan devised by his psychiatrist was persuaded by two other inmates to discontinue taking his medication. This inmate-patient, so long as he continued his medication, exhibited a relatively stable mental health condition; however, once the patient discontinued his medication his mental condition destabilized to the point that he required further psychiatric care and treatment.

3. *Proper Treatment of Mental Illness Among Inmates at the SDSP*

a. The development of a plan for the appropriate treatment of mental illness among inmates at an institution such as the SDSP requires a detailed assessment of the needed levels of care.

b. There are three levels of care which are essential in providing an adequate system of psychiatric and psychological care. Absent such a system, the probability is strong that inmates requiring psychiatric and psychological treatment will not be cared for adequately and will experience unnecessary mental and/or physical deterioration in the general inmate population.

c. The first necessary level of care consists of in-patient hospitalization care to treat acutely psychotic individuals, individuals experiencing suicidal tendencies, and those other individuals most significantly impaired by psychiatric illness.

d. The second necessary level of care consists of intermediate care and treatment for those individuals who have been stabilized by medication and supportive psychotherapy but who cannot return immediately to the general inmate popula-

tion. This level of care is designed to provide a transition for inmates coming from an inpatient psychiatric hospital environment back into the general inmate population. An intermediate level care facility would provide the inmates an environment less intensive than the first level psychiatric hospital, but more supportive than that provided by the general population facility. An intermediate level care facility requires appropriate nursing staff, support staff, and psychiatric and psychological staff.

e. The third necessary level of care consists of out-patient care for inmate-patients who have received psychiatric treatment and who have returned to the general population so that these inmates can have prescribed medications monitored and can receive supportive group or individual psychotherapy as indicated.

f. The mental health needs of inmates at the SDSP require that the SDSP maintain an acute (first level) care and an intermediate (second level) care facility equipped with approximately twenty to twenty-five beds. Of these number, approximately eight to ten beds would be devoted to psychiatric care—requiring twenty-four hour nursing coverage and adequate support staff. The remaining beds would be devoted to intermediate care.

g. Staffing for this facility would require a full-time psychiatrist, two full-time psychologists, approximately six full-time equivalent nurses in order to provide twenty-four coverage, at least four full-time equivalent counselors or psychiatric social workers to provide support to the psychiatric and psychology staff, and the necessary correctional staff to provide twenty-four hour security over the facility.

h. The mental health needs of inmates at the SDSP also require that the SDSP provide outpatient (third level) care.

i. In addition to the staff necessary to provide acute and intermediate care, adequate outpatient care would require approximately two days per week of on-site psychiatric coverage, a full-time psychol-ogist whose work is devoted exclusively to the treatment component of mental health care, and increased counseling staff. The full-time psychologist position would be in addition to the present full-time psychologist who performs primarily administrative functions involving the evaluation and assessment of newly admitted inmates. While it is preferable that every counselor have a master's degree, a counselor holding a bachelor's degree accompanied by sufficient experience and appropriate supervision is acceptable.

I. CONDITIONS OF CONFINEMENT—INTAKE AREA

a. Initial medical screening of newly admitted inmates at the SDSP is conducted by corrections officers. There are no formal procedures, guidelines or protocols regarding this initial screening process.

b. There is no training program at the SDSP to properly instruct corrections officers in how to conduct initial medical examinations and assessments of newly admitted inmates.

c. It is good medical practice for an institution such as the SDSP to have protocols relating to the immediate medical screening of newly admitted inmates.

d. A full medical history and physical examination of newly admitted inmates is taken some time within the week that these inmates arrive at the SDSP. The current medical policies of the SDSP provide only for a physical examination of new inmates within fourteen days of admission. Depending upon the date and time of his initial entry to the SDSP, an inmate may spend from eight to fourteen days in the intake area.

e. Although on weekdays inmates in the intake area are typically involved in orientation and classification activities from five to six hours per day, the amount of out-of-cell time afforded these inmates on weekend days is limited to mealtimes and time for attending church. These inmates are denied altogether time

out of their cells for purposes of recreation.

f. The psychological examination and screening of newly admitted inmates at the SDSP is adequate.

g. Aside from the orientation and classification activities and the psychological screening programs conducted for newly admitted inmates, the operation of the intake area at the SDSP constitutes a serious deficiency which has no correctional justification and which could be corrected at no major cost.

h. The SDSP administration has taken reasonable efforts in attempting to acclimate newly admitted inmates, through orientation, classification and counseling programs, to the SDSP prison environment.

## J. ACCESS TO THE COURTS

### 1. *Inmates at the SDSP*

a. The contents of the law library at the SDSP conform to the requirements of this court in the Agreement In Settlement And Judgment Confirming Settlement entered in *Crowe v. Erickson*, No. 72–4101, slip op. at 11 and Exh. A (D.S.D. May 4, 1977). (Nichol, C.J., presiding). From approximately August, 1982 to January, 1983, the SDSP temporarily cancelled all subscriptions for the pocket parts and supplements for volumes contained in the law library—due to an inability to obtain sufficient funding from the state to continue these subscriptions.

b. In addition to the materials contained in the library, the inmates may obtain xerox copies of other documents or cases, up to a maximum of twenty-five pages, from the University of South Dakota law library.

c. There are inmates who have been hired to work in the SDSP law library who have had no previous training or experience in legal research or in the practice of law. There is no paid, full-time, non-inmate staff employed in the law library.

d. At the time that then-inmate Roger Flittie (one of the original named repre-

sentatives of the plaintiff class in the present action) was hired as an inmate law clerk, his only law-related training consisted of a twelve week, four credit community college course in criminal law. Subsequent to his appointment, Flittie sat through another twelve week course in criminal law, and received four credit hours in a community college course in family law.

e. At the time when Mr. Huth, another inmate law clerk, began his work in the SDSP law library, he had no paralegal training. Subsequently, Huth paid the expenses for a paralegal course which he attended outside the SDSP for a time and then completed inside the SDSP by correspondence. This training did not include instruction in methods of legal research.

f. As law clerks in the SDSP law library, Flittie and Huth assisted other inmates in legal research and in preparing and filing appeals of their convictions, post-conviction motions and other matters, and a variety of civil litigation matters, including civil rights actions under 42 U.S.C. § 1983. Huth also assisted other inmates in the filing of institutional grievances against correctional officers and other personnel at the SDSP.

g. Under the consent decree entered into by the parties in *Crowe v. Erickson, supra,* this court ordered that: "The state will provide periodic workshops to train selected inmates in the fundamentals of legal research." The parties to the decree further agreed that this provision among others "constituted the minimum responsibility [of the state toward the inmates at the SDSP] required under law." Although the SDSP has periodically provided certain inmates with law courses conducted by various outside attorneys, this undertaking fails to satisfy the minimum requirements of *Crowe v. Erickson;* the SDSP has failed to train selected inmates, especially inmates selected as law clerks in the law library, in the fundamentals of legal research. Inmates at the SDSP are denied meaningful access to the courts if they must

depend upon inmate workers who are inadequately trained in the fundamentals of legal research to assist them in legal matters.

h. The inmate law clerks determine the order in which inmate requests for access to the law library will be granted. The SDSP normally limits the use of the law library to no more than four inmates at any one time. The library is open from approximately 7:30 to 11:30 a.m. and approximately 12:25 to 3:40 p.m. five days per week.

i. During the time when Flittie and Huth served as law clerks, they were either prohibited or strongly discouraged by correctional officers at the SDSP from assisting other inmates in civil rights litigation against the State of South Dakota or SDSP officials.

j. Inmates proceeding in federal court on their own or with the assistance of another inmate who is inadequately trained in the law are generally a burden on the court—due to their inability to properly prepare and file legal documents.

2. *Inmates at the Women's Correctional Facility*

a. There is no law library at the Women's Correctional Facility in Yankton, South Dakota. Inmates at the facility have access to a set of state statutes.

b. There is no written policy at the Women's Correctional Facility regarding legal access. The Facility currently practices an informal policy which affords any inmate who first requests it access to the University of South Dakota law library approximately thirty miles away. Before transporting an inmate to this library, the warden of the facility attempts to solicit the assistance of either a law student or a faculty member at the school. A notice describing the procedure by which inmates at the Women's Correctional Facility will be transported to the University of South Dakota law library and given assistance if possible is posted on the bulletin board at the Facility. This notice constitutes the primary, if not the only, source of information available to inmates at the Facility regarding legal access.

c. The Women's Correctional Facility does not have professionally trained staff members to assist inmates with their legal problems. An outside legal services program is available to assist these inmates on civil matters only.

d. The average educational background of inmates at the Women's Correctional Facility is a tenth grade education. Approximately ninety per cent of these inmates are indigent.

## III. CONCLUSIONS OF LAW

### A. Scope of Federal Judicial Involvement

At the outset, this Court recognizes that "[t]raditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration." *Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). These problems are "complex and intractable, ... they are not readily susceptible of resolution by [judicial] decree. Most [prisons] require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id.* at 405, 94 S.Ct. at 1807.

However, this court is also mindful that "[c]ourts certainly have a responsibility to scrutinize claims of cruel and unusual confinement.... When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional rights.'" *Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981) (citing *Procunier*, 416 U.S. at 405–06, 94 S.Ct. at 1807–08).

### B. Cruel and Unusual Punishment Under the Eighth Amendment: The Constitutional Standard

In *Rhodes v. Chapman*, 452 U.S. at 344–45, 101 S.Ct. at 2397–98, the Supreme Court confronted for the first time the

contention by inmates that the conditions of confinement at a particular state prison amounted to cruel and unusual punishment in violation of the eighth and fourteenth amendments.[3] The constitutional standards established in *Rhodes* guide this court's decision. The Court there explained:

> No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 [78 S.Ct. 590, 598, 2 L.Ed.2d 630] (1958) (plurality opinion). The Court has held, however, that "Eighth Amendment judgments should neither be or appear to be merely the subjective views" of judges. To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. But such "'judgment[s] should be informed by objective factors to the maximum possible extent.'"

*Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (citations omitted).

■■■ Conditions of confinement which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion), or are "grossly disproportionate to the severity of the crime warranting imprisonment" are violative of the eighth amendment. *Rhodes*, 452 U.S. at 346–47, 101 S.Ct. at 2398–2400. Included in prison conditions that involve the unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Gregg v. Georgia*, 428 U.S. at 183, 96 S.Ct. at 2929; *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), *quoted in Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

Both the plaintiff class and the defendants agree that *Rhodes* counsels this court to examine the totality of conditions of confinement in order to determine whether the plaintiff class has stated an eighth amendment violation.[4] The Court in *Rhodes* declared that "conditions ... alone or in combination" may constitute cruel and unusual punishment. *Id.; see* 452 U.S. at 363 n. 10, 101 S.Ct. at 2407 n. 10 (Brennan, J., concurring) ("The Court today adopts the totality-of-the-circumstances test.") Justice Brennan in a concurring opinion explained:

> It is important to recognize that various deficiencies in prison conditions "must be considered together." *Holt v. Sarver*, 309 F.Supp. [362, 373 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir.1971)[5]]. The individual conditions "exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates." *Ibid.* Thus, a court considering an Eighth Amendment challenge to the conditions of confinement must examine the totality of the circumstances. Even if no single condition of confinement would be unconstitu-

---

**3.** The eighth amendment, which prohibits "cruel and unusual punishments", U.S. Const.amend. VIII, is applicable to the States through the fourteenth amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

**4.** The vast majority of federal courts have interpreted *Rhodes* as adopting the "totality of conditions" standard. *See Ruiz v. Estelle*, 679 F.2d 1115, 1139 & n. 98 (5th Cir.) (citing cases), *modified per curiam*, 688 F.2d 266 (5th Cir.

1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

**5.** One commentator has remarked that the district court in *Holt v. Sarver* was the first court to employ the totality-of-conditions test in analyzing conditions of confinement. *See* Robertson, *When the Supreme Court Commands, Do the Lower Courts Obey? The Impact of Rhodes v. Chapman on Correctional Litigation*, 7 Hamline L.Rev. 79, 81 n. 15 (1984).

tional in itself, "exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Laaman v. Helgemoe*, 437 F.Supp. 269, 322–[23 (D.N.H.1977).].

*Rhodes*, 452 U.S. at 362–63, 101 S.Ct. at 2407 (Brennan, J., concurring).

In order for this court to make a judgment based on "objective factors to the maximum possible extent" and on "contemporary standards of decency", it is necessary to consult pertinent expert opinions in the form of sworn testimony and exhibits received in evidence, relevant case law regarding particular conditions of confinement in a factually similar setting, and various nationally recognized correctional standards relating to particular conditions. In this regard the court also draws from the conclusions and recommendations contained in the SDSP Study. While the opinions of experts as well as the correctional standards promulgated by certain professional organizations, such as the American Correctional Association, the American Public Health Association and the American Medical Association, do not establish *per se* the constitutional minimum standards of decency, they do establish recommended goals which are instructive on certain questions. *See Rhodes*, 452 U.S. at 348–49 n. 13, 101 S.Ct. at 2400 n. 13; *Ramos v. Lamm*, 639 F.2d 559, 567 n. 10 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

C. Legal Effect of Changed Conditions and Practices Occurring in the Midst of or in Anticipation of Trial.

 This court is aware that with respect to several of the allegedly unconstitutional conditions and practices of confinement at the SDSP the defendants have instituted in the midst of or in anticipation of trial changes or improvements, or have presented evidence of planned, future changes or improvements. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952). As a general proposition, the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.... The defendant is free to return to his old ways." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (footnote omitted). Although defendants' efforts to ameliorate or correct in the midst of or in anticipation of trial various alleged deficiencies at the SDSP are commendable, they do not deprive this court of the power to order injunctive and/or declaratory relief, where otherwise proper, unless: "(1) it can be said with assurance that 'there is no reasonable expectation' that the alleged violations[s] will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897). Defendants bear a "heavy" burden of showing that both of these conditions have been satisfied in order to render moot any allegedly deficient conditions or practices of confinement. *County of Los Angeles*, 440 U.S. at 631, 99 S.Ct. at 1383. One way, of course, to meet this burden is by consent or stipulation of the parties which is entered in the record and so decreed by the court.

D. Application of the Constitutional Standard to the Findings

1. General

 At the core of the eighth amendment lies the state's obligation to provide inmates with reasonably adequate shelter, fire protection provisions, food, sanitation, ventilation, medical care, dental care and mental health care, hygienic materials and utilities, such as hot and cold water, light, heat and plumbing. *See Ramos v. Lamm*, 639 F.2d at 568; *Newman v. Alabama*, 559

F.2d 283, 291 (5th Cir.1977), *rev'd in part on other grounds,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Grubbs v. Bradley,* 552 F.Supp. 1052, 1122 (M.D.Tenn.1982). These are the "basic necessities of civilized life" which are wholly controlled by prison administration and staff; inmates must necessarily rely on administration and staff to ensure that these basic needs are met. *Grubbs v. Bradley,* 552 F.Supp. at 1122; *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

### 2. Environmental Conditions—Cell Halls

#### a. *Fire Safety*

The South Dakota Penitentiary Study ("SDSP Study") supports each court finding with respect to fire safety in the SDSP cell halls. *See* SDSP Study at 88, Appendix A at 41–46, 49 (unnumbered pages of appendix numbered in sequence according to "Evaluation Summary", SDSP Study at 90–91). In adopting such findings, the court minimizes its intrusion into the details of prison administration with respect to fire safety, allowing South Dakota's own state-sponsored published standards to govern. *Cf. Williams v. Edwards,* 547 F.2d 1206, 1213 (5th Cir.1977) (use in part of state fire and health codes to establish eighth amendment violation minimizes intrusion by federal court into details of prison administration).

#### b. Ventilation and Heating System

The SDSP Study concluded that "[a]ll housing areas are deficient in air movement." Appendix A at 3. The SDSP Study also disapproved the inadequate ventilation in the West Hall lower level shower area, *see id.* at 1, as well as the generally obsolete heating system servicing all three cell halls: "The existing heating system is inefficient and the facility design generally does not allow for proper distribution of tempered air. This is a result of both obsolescence in [the] original design of various sections [of the SDSP] as well as the patch-work accumulation of [heating] components." *Id.* at 47; *see also id.* at 48, 49.

On several occasions, federal courts have held ventilation and heating deficiencies similar to those existing at the SDSP violative of the eighth amendment. *See Ramos v. Lamm,* 639 F.2d at 569–70 (inadequate ventilation especially in cell and shower areas, coupled with deficient heating system and other unsanitary conditions constitutes breach of "minimal shelter and sanitation standards contribut[ing] immeasurably in making the main living areas unfit for human habitation."); *French v. Owens,* 538 F.Supp. 910, 913, 926 (S.D.Ind.1982); *Hutchings v. Corum,* 501 F.Supp. 1276 at 1282, 1293 (W.D.Mo.1980) (constitutionally inadequate ventilation system); *Palmigiano v. Garrahy,* 443 F.Supp. 956, 962, 979, 987 (D.R.I.1977), *remanded on other grounds,* 599 F.2d 17 (1st Cir.1979); *Pugh v. Locke,* 406 F.Supp. 318, 323, 329, 334 (M.D.Ala.1976), *aff'd in relevant part and remanded sub nom. Newman v. State of Alabama,* 559 F.2d 283 (5th Cir.1977), *rev'd in part on other grounds,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam) *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

#### c. *Overhead Lighting and Electrical Wiring*

The SDSP Study concluded that: "An area of deficiency [in the three cell halls] is the obsolescence [sic] of the cell block construction and the lack of adequate lighting in the cells. This inadequacy goes further to present a very real safety hazard, with inadequate and exposed wiring and an array of extension cords." Appendix A at 5; *see also id.* at 49 (provisions for electricity in cell blocks are generally obsolete); *id.* at 39 (in large part, electrical wiring is substandard and nonconforming to Underwriters Electrical Code).

Several courts have also condemned similar lighting and electrical wiring deficiencies as violative of the eighth amendment. *See Grubbs v. Bradley,* 552 F.Supp. at 1052, 1072–74, 1098–99, 1126 (inadequate lighting and electrical wiring); *French v.*

*Owens,* 538 F.Supp. at 913–14, 926 (inadequate in-cell lighting); *Ramos v. Lamm,* 485 F.Supp. 122 at 135, 155 (D.Colo.1979) (same); *Palmigiano v. Garrahy,* 443 F.Supp. at 961, 979–80, 987 (same); *Pugh v. Locke,* 406 F.Supp. at 323, 329, 334 (inadequate lighting and electrical wiring).

### d. Hot Water and Water Temperature Control System

The SDSP Study noted the absence of running hot water in the cells in Federal Hall. *See* Appendix A at 19. Basic personal hygiene requires the availability of hot running water, and for this reason, several courts have condemned the absence of hot water as violative of the eighth amendment. *See Grubbs v. Bradley,* 552 F.Supp. at 1100, 1126, 1132; *French v. Owens,* 538 F.Supp. at 925, 926; *Lightfoot v. Walker,* 486 F.Supp. 504, 510, 525, 528 (S.D.Ill. 1980); *Ramos v. Lamm,* 485 F.Supp. at 135, 155; *Battle v. Anderson,* 447 F.Supp. 516, 523, 524–25 (E.D.Okla.), *aff'd,* 564 F.2d 388 (10th Cir.1977); *Palmigiano v. Garrahy,* 443 F.Supp. at 961, 979, 987; *Pugh v. Locke,* 406 F.Supp. at 323, 332. The provision for delivery of hot water once each day to inmates in Federal Hall does not rectify this fundamental deficiency.

Plaintiffs complain of the potential for burning and scalding due to the extremely high temperatures of running hot water in individual wash basins in cells in East Hall. Although the cell wash basins in East and West Halls lack an automatic mixing valve to deliver running water at reasonably comfortable temperatures, the court concludes that, so long as these basins are equipped with stoppers or plugs in order to allow inmates to manually blend hot and cold water, these deficiencies are adequately rectified.

### 3. Environmental Conditions—Kitchen and Food Storage Areas

The SDSP Study supports several of the court's findings regarding environmental conditions in the kitchen and food storage areas. With respect to the provisions at the SDSP for proper food storage, in order to preserve foods and prevent waste, spoilage and the spread of food-borne diseases, the Study concluded:

> This is an area in which the existing physical plant is grossly deficient. The kitchen area, remodeled in 1944, has no walk-in freezer, as an institution of this size should. Also, the basement located food storage area is inadequate in every respect including the ability to be secured against pilferage. Use of the former slaughterhouse for food supply warehousing helps to ameliorate this problem but creates a separate logistic problem in the frequent movement of supplies which it necessitates.

Appendix A at 30. *See also id.* at 28 (ventilation in kitchen area is "makeshift and hazardous;" inmates regularly circulate through kitchen; "[k]itchen elevator is outdated and unsafe;" and kitchen hoods lack an ancillary fire protection system); *id.* at 31 (food storage provisions in food preparation area are "[v]ery poor ... both in quality and in basement location"). These conclusions were substantiated by expert testimony at trial.

Several courts have condemned as violative of the eighth amendment similar environmental conditions in the kitchen and food storage areas. *See Ramos v. Lamm,* 639 F.2d at 570–72 ("old, outdated" kitchen and food storage area, inadequate kitchen ventilation, active rodent and insect infestation, improper food storage, non-compliance with state health code, along with other unsanitary conditions and practices in food service areas has "substantial and immediate detrimental impact" on health of inmates in maximum security unit of Colorado State Penitentiary); *Grubbs v. Bradley,* 552 F.Supp. at 1074–75, 1089, 1099–1100, 1128, 1132 (improper food storage, active rodent infestation, "old, dirty and uncleanable" utensils, leakage of overhead plumbing line onto stored food box, generally dirty refrigerator, among other unsanitary conditions and practices pose "substantial risk" to health of inmates in three Tennessee prisons); *French v. Owens,* 538 F.Supp. at 921–22; *Lightfoot v. Walker,* 486

F.Supp. at 512–13, 524, 525, 528; *Battle v. Anderson,* 447 F.Supp. at 522, 523, 525; *Palmigiano v. Garrahy,* 443 F.Supp. at 962–63, 979–80, 987; *Laaman v. Helgemoe,* 437 F.Supp. at 278–79, 323, 326; *Pugh v. Locke,* 406 F.Supp. at 323, 329, 334. *See also Capps v. Atiyeh,* 559 F.Supp. 894, 914, 915 (D.Ore.1982) (milk pasteurization process, due to non-functioning thermometer, alone constitutes cruel and unusual punishment).

### 4. Environmental Conditions—Shops and Vocational Programs

Inadequate ventilation in regard to cell areas has been condemned by several courts as violative of the eighth amendment under the totality-of-conditions standard. *See supra* at p. 1049. The court likewise recognizes the potentially harmful health effects of inadequate ventilation in the welding and furniture upholstering shops at the SDSP, especially since toxic fumes are often present in these shops. In *French v. Owens,* 538 F.Supp. at 921, 926, the court held that inadequate ventilation in the furniture shop and in the paint spray booths at an Indiana prison, along with the use by inmates of toxic glues without adequate ventilation, respirators or gloves, contributed to a finding of cruel and unusual punishment under the totality-of-conditions test.

The court concludes that the findings of fact with respect to environmental conditions in the SDSP shops and vocational programs demonstrate serious deficiencies presenting health hazards to inmates employed in these areas.

### 5. Conditions of Confinement—Double-Celling

#### a. *General Inmate Population*

In *Rhodes,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59, the Supreme Court held that double-celling does not constitute a *per se* violation of the eighth amendment. The Court overturned a lower court injunction prohibiting, except as a temporary measure, double-celling at an Ohio prison. A careful review of the totality of conditions of confinement present in *Rhodes,* as compared with the totality of conditions existing at the SDSP leads this court to distinguish *Rhodes* on its facts.

The Ohio prison scrutinized in *Rhodes* was described by the district court as "unquestionably a top-flight, first-class facility." 434 F.Supp. 1007, 1009 (S.D.Ohio 1977). It was built in the early 1970's and the cells, which each measured approximately 63 square feet, were described as "exceptionally modern and functional." 452 U.S. at 349 n. 13, 101 S.Ct. at 2400 n. 13. The cells were adequately ventilated and temperatures throughout the cellblock were "well-controlled". *Id.* at 342, 101 S.Ct. at 2397. A heating and air circulation vent was located near the ceiling of each cell and a majority of cells had a window that inmates could open or close. *Id.* at 341, 101 S.Ct. at 2396. Each cell contained a sink with hot and cold running water and each cell was equipped with a built-in radio. *Id.* Located adjacent to each cell block was a dayroom furnished with a wall-mounted television, card tables, and chairs; the dayroom was open to inmates each day between 6:30 a.m. and 9:30 p.m. *Id.* Of those inmates double-celled (approximately 1400 out of a total inmate population of 2300), about 75 percent had the opportunity "of spending much of their waking hours outside their cells, in the dayrooms, school, workshops, library, visits, meals, or showers." *Id.* at 341, 101 S.Ct. at 2396. Job and educational opportunities diminished only marginally as a result of double-celling. *Id.* at 348, 101 S.Ct. at 2400. The kitchen and food services were adequate, and there was no evidence of systematic failures to meet inmate medical or dental needs. *Id.* at 342, 101 S.Ct. at 2396–97. Amidst these "generally favorable findings", *Id.* at 343, 101 S.Ct. at 2397, the Supreme Court held that "double-celling under these circumstances" did not constitute cruel and unusual punishment in violation of the eighth amendment. *Id.* at 348, 101 S.Ct. at 2400.

This court's findings of fact detail the extent of double-celling at the SDSP and its

impact on all programs and services, as well as on the physical plant. The court is convinced that these findings taken together with the other findings respecting various conditions of confinement at the SDSP distinguish the instant case from *Rhodes.*

In contrast to the "exceptionally modern and functional" facility under review in *Rhodes,* the SDSP is generally old and nonfunctional; inmates housed in individual cells in West, East and Federal Halls are subjected to numerous substandard living conditions. In this regard, the SDSP Study, at 95, concluded: "Existing cell blocks are totally unsatisfactory for housing inmates from the individual and combined application of numerous minimum standards for correctional facilities."

This court's findings with respect to various conditions of confinement at the SDSP run contrary to the "generally favorable findings" cited in *Rhodes:* the ventilation system, especially regarding West Hall where the majority of double-celling exists, is inadequate; the heating system in all three cell halls is generally inadequate and fails to adequately control air temperatures throughout each cell hall; several inmates are double-celled in Federal Hall where there is no running hot water; there are no lounges or dayrooms available to ameliorate the effects of double-celling (see SDSP Study, Appendix A at 7, 12); the Warden at the SDSP testified that double-celling at the SDSP has placed undue burdens on various services, programs and maintenance activities with respect to the physical plant; the SDSP is grossly understaffed; overcrowding at the SDSP has a negative impact on the availability of jobs for a significant number of inmates; several unsanitary conditions exist in the kitchen and food storage areas; and system-wide deficiencies are present in the areas of physical and mental health care. These findings, despite other more favorable findings such as the generally adequate level of sanitation throughout the SDSP, the generally low tension among inmates and among inmates and staff, and the sincere efforts made by the SDSP administration and staff to maintain a healthful prison environment,

constitute for the most part structural deficiencies of a permanent nature in numerous services, programs and in the physical plant at the SDSP. Many of these findings relating to structural deficiencies at the SDSP spring directly from the State-commissioned SDSP Study. The record in this case supports the conclusion that overcrowding, as evidenced by the extent of double-celling, substantially contributes to the substandard living conditions at the SDSP.

Several post-*Rhodes* decisions have held the practice of double-celling, when considered among the totality of conditions of confinement similar to those prevailing at the SDSP, unconstitutional under the eighth amendment.

*See Grubbs v. Bradley,* 552 F.Supp. at 1070–87, 1110–13, 1125–26, 1131 (extensive double-celling in old, poorly-maintained Tennessee prison units, combined with inadequate ventilation, lighting, fire safety provisions, job and educational opportunities, kitchen and food storage facilities, physical and mental health care, and other deficient conditions); *French v. Owens,* 538 F.Supp. at 924–26, 927 (distinguishing *Rhodes;* double-celling in 59 year old Indiana prison, combined with inadequate ventilation and heating system, deficient electric wiring, unsanitary kitchen and food areas, inadequate fire protection provisions, inadequate job and vocational opportunities, no running hot water in cell basins, absence of dayrooms, inadequate medical care, and other conditions); *Cf. Hendrix v. Faulkner,* 525 F.Supp. 435, 463–510, 525–26 (N.D.Ind.1981), *aff'd in relevant part sub. nom. Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984) (although double-celling not practiced, excessive in-cell time in cells ranging in size from 54 to 59.2 square feet in Indiana state prison over 100 years old, combined with otherwise constitutionally adequate conditions of confinement, constituted unconstitutionally overcrowded conditions). *But see Smith v. Fairman,* 690 F.2d 122 (7th Cir.1982), *cert. denied,*

461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983) (double-celling approximately 56 percent of the general inmate population at an Illinois prison in cells ranging in size from roughly 55 to 65 square feet—combined with totality of other conditions of confinement—did not constitute eighth amendment violation).

In *Burks v. Walsh*, 461 F.Supp. 454 (W.D.Mo.1978), *aff'd sub. nom. Burks v. Teasdale*, 603 F.2d 59 (8th Cir.1979), a pre-*Rhodes* decision, the court held *inter alia*, that double-celling inmates in 65 square foot cells (Housing Unit 3 constructed in 1865), combined with other conditions of confinement at the Missouri State Penitentiary, did not violate the eighth amendment. 461 F.Supp. at 487–88. This court distinguishes the holding in *Burks* on two grounds. First, although basing its decision on the totality-of-conditions standard, the *Burks* court limited its analysis only to inmate allegations concerning "over-crowding and unsanitary conditions", deferring other issues, such as claims of inadequate medical care, for a separate trial. 461 F.Supp. at 456 & n. 1. Second, although the Eighth Circuit affirmed in general the district court, the appeals court did so "[s]ubject to [certain] observations, requirements and possible caveats." *Burks v. Teasdale*, 603 F.2d at 63. In this regard, the Eighth Circuit made the following observation with respect to the practice of double-celling inmates in Housing Unit 3:

> We are concerned with the action of the district court in permitting double-celling to continue permanently or indefinitely in Housing Unit 3. We do not hold categorically that putting two men in a cell with a floor space no larger than 65 square feet either is or is not constitutionally permissible ... But, we think that it must be recognized that putting two men in such a small cell and keeping them there for long periods of time can produce intolerable tensions and will almost inevitably cause trouble not only to the inmates but also prison personnel. As stated, the district court has retained jurisdiction of the case; we think that the district judge should keep a close

watch on the situation in Housing Unit 3, and we think that whether constitutionally required or not, double-celling in that unit ought to be eliminated when practicable.

*Id.*

### b. *Inmates Housed in the Intake and Protective Custody Areas*

The practice of double-celling newly admitted inmates, taken together with other conditions of their confinement at the SDSP (*see* Findings of Fact, *supra*, II. E.5. & I.), particularly the fact that qualified medical staff do not timely screen these inmates for potentially dangerous communicable diseases (*see* Conclusions of Law, *infra*, III. D.7.d.), constitutes a serious deficiency. *Cf. Lareau v. Manson*, 651 F.2d 96, 107–08 (2d Cir.1981) (confining up to eight new arrivals in double-bunked dormitory and forcing some of them to sleep on mattresses placed on the floor—combined with other conditions, especially inadequate medical screening—constitutes cruel and unusual punishment in violation of eighth amendment).

At their own request, protective custody inmates at the SDSP are removed from the general population and confined to a group of cells located in East Hall. As such, these inmates are subject to the same general conditions of confinement as are inmates in the general population, i.e., environmental conditions, health care policies and practices, and general effects of double-celling. Inmates housed in protective custody, despite their having chosen this confinement status, retain their eighth amendment rights.

The fact that these inmates for the most part requested placement in protective custody does not change the status of their conditions of incarceration. It is obvious that those who request protective custody must exercise the classic Hobson's choice. They opt between the lesser of two evils, and in no way can those inmates requesting protective custody be characterized as having exercised voluntary relinquishment of a

known right to be free from incarceration under conditions which are intolerable and a clear violation of Eighth Amendment standards.

*M.C.I. Concord Advisory Board v. Hall,* 447 F.Supp. 398, 401 (D.Mass.1978).

The practice of double-celling protective custody inmates, considered along with other conditions of their confinement at the SDSP, particularly the insufficient out-of-cell time available (*see* Findings of Fact, *supra,* II.F.), constitutes a deficiency of constitutional dimension. In *Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir.1980), the Eighth Circuit recognized that the duration of confinement affects whether the conditions of incarceration are constitutionally adequate. Even acknowledging that "most inmates are confined in the jail for relatively short periods of time," the court had "no trouble" in holding that overcrowded conditions which accorded each inmate approximately eighteen to twenty-six square feet of dormitory space, coupled with only a few hours each week of out-of-cell time, constituted cruel and unusual punishment. *Id.* at 506.

Several courts have held unconstitutional the practice of double-celling protective custody inmates under conditions similar to those existing at the SDSP. *See French v. Owens,* 538 F.Supp. at 916, 924, 926, 927 (double-celling protective custody inmates combined with severe restrictions on out-of-cell time); *Burks v. Walsh,* 461 F.Supp. at 486–89 (double-celling protective custody inmates, who had "substantially less" out-of-cell time than inmates in general population, in cells measuring 47.18 square feet, is "plainly intolerable"); *Battle v. Anderson,* 457 F.Supp. 719, 738 (E.D.Okla.1978) (double-celling protective custody inmates

in overheated cells, combined with no outdoor exercise but approximately two hours per day out-of-cell time, constitutes conditions of confinement which "are punitive in nature and would not be allowable even if the inmates were being subjected to disciplinary sanctions"), *remanded on other grounds,* 594 F.2d 786 (10th Cir.1979); *M.C.I. Concord Advisory Board v. Hall,* 447 F.Supp. at 401, 404 (double-celling protective custody inmates in cells measuring approximately sixty-six square feet, accompanied by inadequate ventilation, plumbing and lighting, is "sufficiently shocking as to violate standards of common decency").

### 6. Conditions of Confinement—Protective Custody Inmates

Protective custody inmates at the SDSP are denied various educational and job opportunities, various dining, outdoor recreation and visiting privileges, and access to various programs and other activities otherwise available to inmates in the general population (*see* Findings of Fact, *supra,* II.F.). A necessary component of protective custody status, however, is the limited access to programs, activities and privileges that would tend to bring inmates accorded this status in contact with inmates in the general population. *See Lovell v. Brennan,* 566 F.Supp. 672, 691 (D.Me.1983). Protective custody inmates desire this protection and defendants have an interest in maintaining it—principally by isolating these inmates from other inmates.

▮▮ Whether under the equal protection clause of the fourteenth amendment[6] or the "unconstitutional conditions" standard developed in *Wojtczak v. Cuyler,* 480 F.Supp. 1288, 1291, 1302–07 (E.D.Pa.1979),[7]

---

6. Under the equal protection clause, defendants are entitled to place restrictions on the opportunities, rights and privileges accorded protective custody inmates, as compared to those available to inmates in the general population, provided that these restrictions are rational rather than arbitrary and capricious. *Nadeau v. Helgemoe,* 561 F.2d 411, 416 (1st Cir.1977). In order to prevail on an equal protection claim, the protective custody inmates must demonstrate "that they received treatment which was invidiously dissimilar to that received by other inmates."

*Lyon v. Farrier,* 730 F.2d 525, 527 (8th Cir.1984) (per curiam).

7. In *Wojtczak v. Cuyler,* the court concluded:

[T]he denial to [a protective custody inmate] of benefits which other prisoners enjoy, solely because he is in need of protection from other inmates, violates the Eighth Amendment unless the disparity is justified by considerations of institutional security. Put differently, ... absent valid security considerations, [a protective

the interests of protective custody inmates in increased access to opportunities, rights and privileges accorded other inmates must be balanced with the legitimate interests of the defendants—as well as of protective custody inmates—in securing protection for inmates in protective custody.

The Court concludes that there are valid security considerations present for, and defendants have a rational basis for, placing restrictions, of the kind and to the extent detailed in the findings of fact, on the rights, privileges and opportunities available to protective custody inmates. *See Lovell v. Brennan*, 566 F.Supp. at 690–92. Plaintiffs have not shown that protective custody inmates at the SDSP receive "treatment invidiously dissimilar to that received by other inmates." *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir.1984) (per curiam).

### 7. Health Care

#### a. *Constitutional Standard*

Although the adequacy of health care is included in the totality of conditions which determine whether inmates have been subjected to cruel and unusual punishment, *see e.g., Rhodes*, 452 U.S. at 342, 101 S.Ct. at 2396–97, a separate standard governs whether prison health care, standing alone, is constitutionally adequate. The Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (quoting *Gregg v. Georgia*, 428 U.S. at 173, 96 S.Ct. at 2925). In reaching this conclusion the Court explained: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* 429 U.S. at 103, 97 S.Ct. at 290.

■ Where, as here, a class of inmates challenge as unconstitutional a prison's entire health care system, "deliberate indifference to serious medical needs" is established where systematic deficiencies in staffing, facilities, equipment, or procedures effectively deny inmates access to adequate health care. *See Wellman v. Faulkner*, 715 F.2d at 272; *Ramos v. Lamm*, 639 F.2d at 575; *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977) ("[w]hen systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers").

■ A court need not wait "until an inmate bleeds to death" or until institutional health care deficiencies reach catastrophic proportions in order to exercise its declaratory or injunctive powers to cure an otherwise inadequate health care system. *Palmigiano v. Garrahy*, 443 F.Supp. at 973; *see Todaro v. Ward*, 565 F.2d at 53 (institutional practices need not be defective in maximum degree before eighth amendment violation is found).

#### b. *Application of Constitutional Standard to the Findings*

#### (i) Use of Inmate Workers

The court's findings detail the extent to which inmate workers have been used by the SDSP to perform various medical and dental tasks. These inmates have no formal training or education in the medical or dental care fields. They have performed or substantially assisted qualified personnel in performing a variety of medical and dental care services, including the direct treatment of other inmates, the scheduling of other inmates for health care services, the taking of both medical and dental x-rays, the conducting of initial examinations, the screening and diagnosis of inmate-patients at times when no qualified personnel are present, and the operation of certain equipment for which they are not trained. In

---

custody inmate] may not be required to renounce his right to reasonable protection from other inmates as a condition of receiving the opportunities afforded to prisoners in the general population.
480 F.Supp. at 1303 (footnotes omitted).

addition, these inmate workers have access to other inmates' medical records.

Several courts have condemned as violative of the eighth amendment the use of untrained inmate workers to perform health care services similar to those performed by inmate workers at the SDSP. *See Ramos v. Lamm*, 639 F.2d 577–78 (use of untrained inmates as lab technicians, dental assistants, orderlies, x-ray technicians, and medical file clerks effectively denies inmates access to diagnosis and treatment by qualified personnel and contributes to constitutionally inadequate health care system); *Williams v. Edwards*, 547 F.2d at 1216–19 (use of untrained inmate workers to, among other things, treat other inmates, operate x-ray equipment as well as other technical equipment, and handle other inmates' medical records contributes to unconstitutional health care system); *Lightfoot v. Walker*, 486 F.Supp. at 517, 524–25, 526–27 (use of untrained inmate workers to prescribe and distribute medicine, participate in sick call screening, handle medical records, and perform laboratory work contributes to unconstitutional health care system).

The American Medical Association Standards For Health Services In Prisons (1979) (Exhibit no. 170; hereafter cited "AMA Standards") establishes twenty-three "essential" accreditation standards which are "recognized by organized medicine as critical for a viable [prison] health care delivery system." AMA Standards at ii. One of these essential standards (no. 133) prohibits inmates from "[p]erforming direct patient care services, [s]cheduling health care appointments, [d]etermining access of other inmates to health care services, [h]andling or having access to ... [h]ealth records, and [o]perating equipment for which they are not trained." *Id.* at 17. The SDSP's use of untrained inmate workers violates this essential standard.

### (ii) Emergency Medical Care

In *Laaman v. Helgemoe*, 437 F.Supp. at 312–13, the court held that:

inmates are entitled to qualified medical coverage at all times, sufficient to meet both their routine and emergency health care needs. A failure to staff a prison around the clock with qualified personnel trained to identify and cope with medical emergencies and reliance upon unqualified and untrained inmates, civilians and employees of prison to make medical decisions and to perform medical functions infringe upon the constitutional rights of prisoners.

Several courts have condemned as contributing to an unconstitutional health care system various emergency health care provisions or inadequacies similar to those existing at the SDSP. *See Palmigiano v. Garrahy*, 443 F.Supp. at 974, 983–84 (lack of certain "essential" emergency medical equipment such as a defibrillator and suction devices; emergency nursing staff untrained in administering CPR and in treating other commonly occurring emergencies; and lack of protocols or in-service training programs concerning treatment of various medical emergencies); *Burks v. Teasdale*, 492 F.Supp. 650 at 678 (W.D.Mo.1980) (failure to provide crash cart in reasonably accessible location so to avoid unnecessary delay in administering treatment in event of emergency); *Lightfoot v. Walker*, 486 F.Supp. at 520, 527 (inadequate defibrillator believed to have caused adult inmate's death; court ordered Illinois prison to obtain adequate emergency medical equipment); *Ramos v. Lamm*, 485 F.Supp. at 158, *aff'd in relevant part*, 639 F.2d at 575–76, 578 (lack of qualified emergency medical staff).

Emergency medical care provisions at the SDSP also violate certain essential AMA standards. *See* AMA Standards at 29, No. 154 (prison must have protocols providing for "24-hour emergency medical and dental care"); *id.* at 15, No. 128 (prison must provide training program to adequately train "all correctional personnel who work with inmates to respond to health-related emergency situations"; such training to include appropriate responses to various emergencies, signs and symptoms of various emergencies, and administration

of first aid treatment); *id.* at 9, No. 225 (prison must have protocols providing for "adequate number of health trained correctional officers", including at a minimum, one such officer per shift who is trained in administering CPR and in recognizing symptoms of common illnesses).

The court concludes that the SDSP fails to provide inmates with minimally adequate emergency health care coverage.

#### (iii) Prescription Drugs

The SDSP lacks an institutional formulary. In *Palmigiano v. Garrahy*, 443 F.Supp. at 975, 983–84, lack of an institutional formulary was condemned as unconstitutional when considered together with other health care deficiencies. A formulary helps to ensure that medication will be prescribed with reasonable consistency, that meaningful data will be compiled on usage of various medications, and that medication will be properly dispensed and distributed. *See id.* at 975.

The lack of an institutional formulary also violates an essential AMA standard. *See* AMA Standards at 34, No. 163.

Provided that corrections officers are adequately trained by the responsible physician in accounting for and recording whether inmates have accepted or refused to accept prescription medication, present procedures for delivering prescription medication to inmates at the SDSP are constitutionally adequate. *See id.* at 14, No. 127 (essential).

The written policies of the SDSP prohibiting or discouraging the use by treating physicians of certain medications, when the use of such medications may under certain circumstances be properly indicated, constitutes a health care deficiency. In *Feliciano v. Barcelo*, 497 F.Supp. 14 (D.P.R. 1979), the court held unconstitutional, as contributing to a deficient health care system, the prison's failure to provide on a regular basis medications necessary to maintain health. *See id.* at 32, 34. The court ordered that inmates be provided with "any medication prescribed by a qualified physician." *Id.* at 41.

#### (iv) Provisions for Special Diets

The court concludes on the basis of the record developed at trial that the SDSP makes adequate provisions for the special dietary needs of the inmates.

#### (v) Protocols

The lack of adequate protocols respecting various aspects of the SDSP health care system violates an essential AMA standard and constitutes a serious deficiency. *See* AMA Standards at 3–4, No. 105 (requiring prison to develop written policies and procedures regarding a variety of health care functions).

#### (vi) Medical Records

The eighth amendment is implicated when " 'inadequate, inaccurate and unprofessionally maintained medical records' give rise to 'the possibility for disaster stemming from a failure to properly chart' " the medical care received by inmates. *Dawson v. Kendrick*, 527 F.Supp. 1252, 1306–07 (S.D.W.Va.1981) (quoting *Burks v. Teasdale*, 492 F.Supp. at 676). In *Burks*, 492 F.Supp. at 676, the court recognized "the critical importance of adequate and accurate medical records in any attempt to provide a continuity of medical care." It held that "inadequate, inaccurate and unprofessionally maintained medical records" constituted a "grave risk of unnecessary pain and suffering" in violation of the eighth amendment. *Id.* at 676, 678. Similarly, in *Lightfoot v. Walker*, 486 F.Supp. at 517, 524–25, the court found that inmate medical records were "disorganized and failed to meet minimal standards" and that the recording system was not properly coordinated to ensure that all medical information and test results were entered in an inmate's file within a reasonable time. The court held that these deficiencies contributed to an unconstitutional health care system, and it ordered prison officials to develop and maintain "[c]omplete and accurate records documenting all medical examinations, medical findings and

medical treatment ... pursuant to accepted professional standards." *Id.* at 527.

Applying these principles to the instant case, the court concludes that the inadequate organization of medical records and files at the SDSP constitutes a deficiency in the health care system.

### (vii) Quality Control

The SDSP lacks a quality control program, particularly governing laboratory services. In addition, the SDSP lacks an institutional formulary (*see, supra* at p. 1038, Finding of Fact G.3.a.). These findings constitute deficiencies of constitutional dimension in the SDSP health care system.

In *Lightfoot v. Walker,* 486 F.Supp. at 518–19, the court found that "[a] primary component of a minimally acceptable correctional health care system is the implementation of procedures to review the quality of medical care being provided." In *Lightfoot,* the court ordered prison officials to establish a quality control program consisting of (1) the promulgation and review of written regulations concerning medical procedures and services; (2) regular audits of medical services; and (3) peer review of all medical personnel on a regular and periodic basis. *Id.* at 527.

Several courts have held the lack of quality control over medical care, when considered among other health care deficiencies, unconstitutional under the eighth amendment. *See Palmigiano v. Garrahy,* 443 F.Supp. at 975, 983–84 (lack of institutional formulary; staff performance evaluations and compilations of statistical data governing various medical services); *Williams v. Edwards,* 547 F.2d at 1216–17 (no written organizational plan or policies or procedures concerning medical tests, no quality control over laboratory services or equipment, and no quality control over dental care); *Dawson v. Kendrick,* 527 F.Supp. at 1273, 1308 (lack of rules, regulations, or policies to record and control deliveries of health care services).

### (viii) Staff

Defendants' health care expert acknowledged that the SDSP has an inadequate number of full-time registered nurses. Other portions of the record support this conclusion, and this court likewise concludes that this inadequacy constitutes a health care deficiency of constitutional dimension.

### (ix) Financial Constraints on Medical and Dental Services

The court's findings establish that inmates at times have been denied treatment for serious medical needs due to the cost of the particular treatment. Prisons may not deny, on account of cost, inmates from obtaining constitutionally adequate health care. *See Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir.1968) (Blackmun, J.) ("Humane considerations and constitutional requirements [under eighth amendment] are not, in this day, to be measured or limited by dollar considerations."); *Todaro v. Ward,* 565 F.2d at 54 n. 8 (inadequate financial resources cannot excuse denial of constitutional rights); *Heitman v. Gabriel,* 524 F.Supp. 622, 624 (W.D.Mo.1981) (costs cannot stand in way of eliminating prison conditions which violate eighth amendment).

### c. *Conditions of Confinement—Mental Health Care*

The adequacy of a prison's mental health care system is governed by the same constitutional standard which applies when determining the adequacy of a prison's medical and dental health care system (*see* Conclusions of Law, *supra,* III.7.a. constitutional standard for medical care). *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977).

The court's findings establish the strong demand for qualified psychiatric and psychological treatment of inmates at the SDSP. There are inmates at the SDSP who have serious psychiatric needs which are not being addressed by qualified personnel; some of these inmates have experienced deterioration in physical health be-

cause their mental health needs have gone untreated. In addition, the findings indicate the critically inadequate number of mental care staff at the SDSP. There is only one psychiatrist available to the inmates; he visits the SDSP one day each week and performs only limited direct, ongoing treatment on inmates. The findings also demonstrate the shortage of psychologists and full-time counselors at the SDSP. In the court's view, the area of mental health care at the SDSP, as detailed in the Court's findings in this area, constitutes an especially grave deficiency at the SDSP.

Courts have condemned as unconstitutional under the eighth amendment various mental health care deficiencies similar to those pervading the SDSP. *See Ramos v. Lamm,* 639 F.2d at 577–78 (inadequate staffing, causing serious mental health care needs of inmates to go untreated, constitutes deliberate indifference to serious mental health care needs of prison population); *Lightfoot v. Walker,* 486 F.Supp. at 521–22, 525 (lack of clinical psychologist to provide group or individual therapy, combined with lack of psychiatrists to perform ongoing psychotherapy on inmates needing treatment and failure of prison officials to design and implement adequate mental health care delivery system subjects inmates to needless suffering and constitutes deliberate indifference); *see also Williams v. Edwards,* 547 F.2d at 1217–18.

Plaintiff's mental health care expert recommended, in the court's view, a reasonable and constitutionally adequate proposal to rectify the serious deficiencies existing in the mental health care system at the SDSP.

#### d. *Conditions of Confinement—Intake Area*

■ The court concludes that, consistent with the findings, the psychological examination and screening of newly admitted inmates at the SDSP is adequate. However the existing policies and procedures respecting medical screening of newly admitted inmates are constitutionally inadequate.

Provisions for adequate and timely medical screening of newly admitted inmates are designed to prevent the spread of disease and to ensure that inmates who are physically ill or who otherwise require it are promptly given treatment.

In general, proper medical screening of inmates is a "vital element of adequate medical services. Written protocols and properly trained staff members are necessary to accomplish this goal." *Lightfoot v. Walker,* 486 F.Supp. at 517. *See Heitman v. Gabriel,* 524 F.Supp. at 627 (procedures for adequate and timely medical screening is integral part of inmate admissions process). In *Lareau v. Manson,* the Second Circuit held that the failure to adequately screen newly admitted inmates in a local jail for infectious diseases constituted a "serious" threat to the health of inmates " 'sufficiently harmful to evidence deliberate indifference to serious medical needs.' " 651 F.2d at 109 (quoting *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292). The court declared that "it is unnecessary to require evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy." *Id.*

#### 8. Access to the Courts

#### a. *The Constitutional Standard*

In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) the Supreme Court "established beyond doubt that prisoners have a constitutional right of access to the courts." *Id.* at 821, 97 S.Ct. at 1494. The Court reviewed a number of its earlier cases and concluded: "[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Id.* at 824, 97 S.Ct. at 1496.

This responsibility of the States toward convicted prisoners is founded on the premise that "habeas corpus and civil rights actions are of 'fundamental importance ... in our constitutional scheme' because they directly protect our most valued rights." *Id.* at 827, 97 S.Ct. at 1498. Recognizing that the primary concern is enabling an

inmate to prepare a petition or complaint, *see id.* at 828 n. 17, 97 S.Ct. at 1498 n. 17, the Court in *Bounds* held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498. The Court further explained:

> [W]hile adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision ... does not foreclose alternative means to achieve that goal. Nearly half the States and the District of Columbia provide some degree of professional or quasi-professional legal assistance to prisoners. Such programs take many imaginative forms and may have a number of advantages over libraries alone. Among the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices.... Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly.... [A] legal access program need not include any particular element we have discussed, and we encourage local experimentation. Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.

*Id.* at 830–32, 97 S.Ct. at 1499–1500 (footnotes and citations omitted).

### b. *Inmates at the SDSP*

The plaintiff class contends that since the defendants do not purport to provide inmates at the SDSP with "adequate assistance from persons trained in the law," the question is whether, under the constitutional principles set forth above, the inmates are provided an adequate law library. There is no contention in this regard that the present library contains an inadequate stock of legal materials. Rather, plaintiffs submit, on the authority of more recent case law interpreting the scope of *Bounds* that the presence of a law library, without adequate provisions for trained legal assistance, is insufficient to accord inmates meaningful access.

"The central question in evaluating whether a law library adequately provides meaningful access to the courts is whether the facility will enable the prisoners to fairly present their complaints to a district court." *Cruz v. Hauck,* 627 F.2d 710, 720 (5th Cir.1980). The defendants bear the burden of proving that the SDSP law library, as presently operated, provides the inmates meaningful access. *See Ruiz v. Estelle,* 679 F.2d at 1154, n. 197; *Storseth v. Spellman,* 654 F.2d 1349, 1352 (9th Cir. 1981).

Several courts have held that an adequate law library as conceived under the principles established in *Bounds* requires some provision for assistance by persons trained in the law. In *Cruz v. Hauck,* the Fifth Circuit held:

> It is not enough simply to say the books are there, when the plaintiffs contend that they do not have the assistance necessary to use the books properly. All of the circumstances must be evaluated in determining the adequacy of a library, and the district court erred by holding that a prison library without any assistance in its use sufficed to provide access to the courts for all the prisoners detained.

627 F.2d at 720. Similarly, in *Glover v. Johnson,* 478 F.Supp. 1075 (E.D.Mich. 1979), the court concluded:

Defendants' position that they are obligated only to provide *either* an adequate law library *or* qualified legal assistance is too narrow a reading of *Bounds*. An adequate library cannot provide meaningful aid to a prisoner unschooled in the most basic techniques of legal research. As a result, courts have recognized the need for the assistance of others who possess these skills in order to render the inmate's right to access effective.

*Id.* 478 F.Supp. at 1096 (emphasis in original; citations omitted).

*See Canterino v. Wilson,* 562 F.Supp. 106, 108–12 (W.D.Ky.1983) (unlimited physical access to sufficiently stocked law library is unavailing to inmates lacking sufficient opportunity or intellectual ability to utilize the facility; adequate library under *Bounds* includes assistance by law-trained advisors so that all inmates have actual access); *Wade v. Kane,* 448 F.Supp. 678, 684 (E.D.Pa.1978) (prison required under *Bounds* to provide assistance to inmates who are unable to perform effective legal research—even though prison maintained sufficiently stocked law library), *aff'd. mem.,* 591 F.2d 1338 (3d Cir.1979); *see also* Comment, *An Overview of Prisoners' Rights: Part I, Access to the Courts Under Section 1983,* 14 St. Mary's L.J. 956, 971–74 & n. 97 (1983) (discussion of what constitutes adequate law library under *Bounds* ).

Applying these principles to the present findings (*see* Findings of Fact, *supra,* J.1.), the court concludes that inmates at the SDSP are denied the fundamental constitutional right of meaningful access to the courts. *Bounds* places on the State of South Dakota the affirmative duty to provide all inmates at the SDSP meaningful access to the courts. More recent case law

interpreting the scope of *Bounds* establishes that a law library, without more, is not sufficient to enable prison inmates, most of whom are unschooled in the basics of legal research and legal writing, "to prepare a petition or complaint." *Bounds,* 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17. Inmates at the SDSP must be afforded a reasonable form of law-trained assistance in the use of the library in order to give effect to the United States Supreme Court mandate in *Bounds.*[8]

#### c. *Inmates at the Womens' Correctional Facility*

█ The court concludes that based on the findings (*see* Findings of Fact, *supra,* II.J.2.), the inmates at the Womens' Correctional Facility are denied their constitutional right of meaningful access to the courts. These inmates are provided neither a law library nor law-trained assistance.

Defendants contend that their informal policy of transporting these inmates, upon request, to a law library approximately thirty miles from the prison is an acceptable, alternative method of providing these inmates meaningful access to the courts. Defendants furthermore submit that this means of access is equivalent to that provided inmates at the SDSP. Defendants have cited no authority in support of their contentions. They bear the burden of proving the adequacy under *Bounds* of any alternative method of meaningful access (*See* Conclusions of Law, *supra,* III.8.2.). Applying the constitutional standard set forth in *Bounds,* defendants have failed to prove that all inmates at the Womens' Correctional Facility are accorded meaningful access to the courts.[9] *See Leeds v. Watson,* 630 F.2d 674 at 676–77 (9th Cir.1980).

---

**8.** The court's holding may be construed as extending beyond the consent decree approved by Judge Nichol in *Crowe v. Erickson,* No. 72–4101, slip op. at 11 & Exh. A (D.S.D. May 4, 1977) (*see* Findings of Fact, *supra,* J.1.a., g). In all probability neither the court nor the parties to that decree had the benefit of the Supreme Court's decision in *Bounds* (decided April 27, 1977). They certainly did not have the benefit of later case law defining the full scope of *Bounds.* It is

with the teaching of this further line of precedent that this court considers the meaningful access issue in a 1984 setting.

**9.** Inmates at the Womens' Correctional Facility also complain that because they are not provided the same means of access to the courts as those accorded inmates at the SDSP, the women inmates are denied equal protection of the law, in violation of the fourteenth amendment. Due

## IV. CONCLUSION

Given the most generous application of judicial restraint, the Court concludes that the totality of conditions of confinement at the SDSP, as enumerated in detail above, subject the plaintiff class to cruel and unusual punishment in violation of the eighth and fourteenth amendments.

The Court reaches this conclusion with the greatest reluctance but the findings of fact compel this result. The prison administration at the SDSP continues to make dedicated good faith efforts to improve the conditions of confinement at the prison. This court is well aware of the financial restraints placed on the defendants, but the good will shown by them cannot serve as a defense. Nor is the lack of financing a defense to a failure to provide minimum constitutional standards. If the state wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutional manner. These considerations properly are weighed by the Legislature and prison administration rather than a court. *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 199, 201 (8th Cir.1974); *see Hendrix,* 525 F.Supp. at 526–27.

The above constitutes the findings of fact and conclusions of law of the court.

### JUDGMENT

For the reasons given in the opinion, it is now

ADJUDGED that the conditions of confinement in the South Dakota State Penitentiary, to the extent set forth in the opinion, violate the Eighth Amendment and the Fourteenth Amendment to the Constitution, and it is further

ORDERED that defendants shall file with the clerk, on or before 120 days from this date, a plan by which defendants propose to change or modify the conditions of confinement to comply with the Eighth Amendment and Fourteenth Amendment.

Upon the filing of such plan by defendants, this Court will, on notice, hear the parties on the issue of whether or not such plan, if implemented by defendants would render constitutional the conditions of confinement, and after such hearing, the Court will enter such further order as appropriate or as required to carry into effect the declaratory judgment set out in the memorandum opinion of the Court.

The Court retains jurisdiction of the parties and subject matter of this action for the purposes above stated; and for the purpose of granting plaintiffs such injunctive relief as may be just and equitable under this judgment.

---

to the disposition of the women inmates' right of access claim under *Bounds,* the court finds it unnecessary to reach their equal protection argument. *See Wojtczak v. Cuyler,* 480 F.Supp. 1288, 1299 n. 12 (E.D.Pa.1979).